**VINSON et al. v. LITTLE BEAR SAWMILLS.**
(8 Div. 926.)

Supreme Court of Alabama. May 26, 1927.

Rehearing Denied June 23, 1927.

**Contracts** &⟶10(2)—**Contract to haul and deliver all lumber cut by other party from certain tracts held unilateral.**

Contract to haul and deliver, from certain crossroads to other party's sawmill, all lumber cut by latter from certain tracts, for stated price per thousand feet, *held* unilateral; there being no binding obligation on defendants to manufacture and deliver lumber to plaintiffs for transportation.

Brown and Somerville, JJ., dissenting.

Appeal from Law and Equity Court, Franklin County; B. H. Sargent, Judge.

Action by W. O. Vinson and another against the Little Bear Sawmills, a partnership, and the individual members. From a judgment of nonsuit, plaintiffs appeal. Affirmed.

The contract in suit is as follows:

"Contract and agreement, by and between, the Little Bear Sawmill, of Red Bay, Ala., hereinafter known as the parties of the first part, and Oscar Vinson and Turner Boland, both of Franklin county, Ala., hereinafter known as parties of the second part, witnesseth:

"1. Parties of the second part hereby agree to haul and deliver to the plant of the first parties all of the lumber cut by first parties off of what is known as the Seaman and the Ezzell tracts of timber, taking said lumber from the crossroads, on the Russellville and Red Bay road, about thirteen miles from Red Bay, and delivering to plant at Red Bay taking good care of the lumber and unloading same as instructed by agent of the first parties at the planing mill.

"2. The price mutually agreed upon by the contracting parties is to be $3.25 per M feet, on green lumber and 50 cents per M less on dry lumber, for the first four million feet. After this amount is hauled there is to be a revision of prices in case lumber has declined as much as $4.00 per M feet or gas and feed has gone up as much as 25 per cent.; there not being a revision of more than 50 cents per M feet either up or down.

"3. The parties of the second part agree to haul as much as 60,000 feet per day, making every effort to keep up with the hauling done by teams to the transfer yard. In case it is impossible to haul this amount because of damage to roads the parties of the second part are to haul all they can under the existing conditions.

"4. The parties of the second part are to take the privilege of operating a commissary, and the parties of the first part are to collect accounts for them through their office in so far as they are able. The expense of building the commissary is to be borne half each by each contracting party. The parties of the second part are to pay the parties of the first part 5 per cent. of gross sales to all employees of the first party, direct or indirect.

"5. Settlements for hauling are to be made the second Saturdays following the 1st and 15th of each month, through the first Saturday following the 1st and 15th of each month.

"Witness our hands and signatures this the 26th day of Feb., 1925."

J. Foy Guin, of Russellville, for appellants.

Where a contract is susceptible of two constructions, one of which will sustain and the other invalidate it, the construction that will uphold the contract is to be adopted by the courts. Lively v. Robbins, 39 Ala. 461; 13 C. J. 539. The object in interpreting contracts is to ascertain, if possible, the intention of the parties. Mason v. Ala. Iron Co., 73 Ala. 270; Minneapolis Mill Co. v. Goodnow, 40 Minn. 497, 42 N. W. 356, 4 L. R. A. 202; Senter v. Senter, 87 Ohio St. 377, 101 N. E. 272.

&⟶For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

A promise is a good consideration to support a promise. Evans v. C. S. & M. R. Co., 78 Ala. 341. The contract here is mutual and binding. 13 C. J. 334; Green v. Lovejoy, 155 Minn. 241, 193 N. W. 173; Ramey Lbr. Co. v. Schroeder Lbr. Co. (C. C. A.) 237 F. 39; Burgess Sulphite Fibre Co. v. Broomfield, 180 Mass. 283, 62 N. E. 367; Hickey v. O'Brien, 123 Mich. 611, 82 N. W. 241, 49 L. R. A. 594, 81 Am. St. Rep. 227. Where a contract is void because not binding on one party, although in express terms binding on the other, a partial performance operates to supply a sufficient consideration then to render the contract valid and binding. Sheffield Fur. Co. v. Hull C. & C. Co., 101 Ala. 446, 14 So. 672; Pullman Co. v. Meyer, 195 Ala. 397, 70 So. 763; Pratt Con. Coal Co. v. Short, 191 Ala. 378, 68 So. 63; Evans v. C. S. & M. R. Co., 78 Ala. 341.

William & Chenault, of Russellville, for appellee.

The contract sued on was not such a contract as that suit could be maintained for its breach. It was indefinite, uncertain, and unilateral. The damages claimed in this suit were of such character as that ascertainment and determination were impossible. Jones v. Lanier, 198 Ala. 366, 73 So. 535; Lucas E. Moore Stave Co. v. Kennedy, 212 Ala. 193, 101 So. 894; Moore Stave Co. v. Woodley, 213 Ala. 570, 105 So. 878; Hazelhurst Lbr. Co. v. Merc. L. & S. Co. (C. C.) 166 F. 191.

THOMAS, J. The appellants took a nonsuit with a bill of exceptions because of the exclusion of the contract from the evidence.

In this ruling there was no error. The recovery sought was for an uncertain and indefinite damage for breach of an agreement pronounced by this court to be unilateral. Jones v. Lanier, 198 Ala. 366, 73 So. 535; Lucas E. Moore Stave Co. v. Kennedy, 212 Ala. 193, 101 So. 894; Lucas E. Moore Stave Co. v. Woodley, 213 Ala. 570, 105 So. 878; Southern Fuel Co. v. Southern R. R. Co., 215 Ala. 355, 110 So. 715.

Plaintiffs testified that they hauled more than 4,000,000 feet of lumber from the transfer yards to the point of destination, or rather that they hauled "all the lumber they (defendants) delivered at the transfer yard"—at the "crossroads"—and that the latter paid them for all lumber so hauled to the point of delivery. There was no binding obligation on defendants to manufacture and deliver other lumber to plaintiffs at said initial point for transportation.

The nature of the subject-matter of the present contract, the cutting and delivery of logs for transportation, as defendants desired, to place upon the yard, and the purchase and character of a vessel to be purchased in Scott v. Moragues Lumber Company, 202 Ala. 312, 80 So. 394, is sufficient to distinguish the cases.

The case of McIntyre Lumber & Export Co. v. Jackson Lumber Co., 165 Ala. 268, 51 So. 767, 138 Am. St. Rep. 66; was considered in Jones v. Lanier, 198 Ala. 364, 73 So. 535, and it was indicated that a contract for the future delivery of personal property "may be void for want of consideration, or for want of mutuality if the contract or any material part thereof is wholly conditioned upon the will or wish of only one of the parties." McIntyre Lumber & Export Co. v. Jackson Lumber Co., supra.

In Jones v. Lanier, supra, the agreement was that Lanier would take and pay for the entire output of Jones' "Baker's Creek mine for nine months at a stipulated price per ton, subject to appellant's coal 'proving entirely satisfactory'" to Lanier—held to be unilateral.

The contract set out in extenso in Lucas E. Moore Stave Co. v. Kennedy, 212 Ala. 193, 101 So. 894, was that the Stave Company agreed "to buy" and Kennedy agreed "to sell" his "entire production of split white oak staves produced" by the latter, "during 1920 at following prices f. o. b. cars shipping point in Mississippi and Alabama." The writing concluded with the following statement:

"In order that we may not compete with each other in the production of split staves, it is agreed that you work the territory between Oakman, Ala., on the Southern Railway, to Birmingham and from Tupelo to Birmingham on the Frisco. Kindly sign copy of this letter, which will serve as a contract."

It was held that the "seller was not legally obligated to produce any staves" under that contract.

In Lucas E. Moore Stave Co. v. Woodley, 213 Ala. 570, 572, 105 So. 878, 880, the court said:

"The last contract is evinced by a letter of June 30, 1923, and which is unilateral and wanting in mutuality, as there is nothing in it binding or obligating the plaintiffs to do anything—just an agreement of the defendant to take all staves at the price fixed."

And in Southern Fuel Co. v. Southern Ry. Co. (Ala. Sup.) 110 So. 715,[1] the court said "the defendant was bound to take the output of the mine," and defendant had no right to compel the other party to operate the mine and had no right in law to "maintain an action for a failure to operate the mine."

There is nothing in the instant contract giving plaintiffs the right to compel the lumber company to (1) cut the timber from the large tracts of land owned by them (Seaman and Ezzell tracts of 6,000 acres); (2) or to compel them to saw the stock into rough lumber in one of its four or five mills, and deliver it upon the "crossroads" yards, or to receive all of its lumber at its planer

---

[1] 215 Ala. 355.

at Red Bay. It will be noted of the alleged agreement that it was dependent on such continuous operations of many branches of lumbering, viz.: (a) Defendants' will and facility to cut and haul stock and manufacture into lumber; (b) upon defendants' will in hauling rough lumber from its mills to a designated transfer yard about 13 miles from its planer; (c) upon plaintiffs' will and ability, to "keep up" with defendants' delivery at yards; (d) and its transportation to the planing mill at a distant point. That is to say, the right of plaintiffs was dependent upon milling, the requirements of planing, and the receipt upon the yards at the planer as "instructed" by plaintiffs' agent "at the planing mill."

The plaintiff testified that the milling operation was closed, saying:

"I hauled or caused to be hauled all lumber delivered at what they call here the transfer yard up until the time this trouble came up. I think they have delivered some there that I have not hauled. I know they have kept delivering and hauling on, even after the mill was closed. I have not hauled under my contract; I never hauled any more after that trouble came up and I sued them. I hauled on, but not under that contract; other folks did too that wanted to. I guess that, up to the time I claim the breach occurred and suit was brought, I hauled all the lumber they delivered at the transfer yard. I brought suit for hauling all that in the Seaman and Ezzell tracts of land. I hauled all the lumber delivered at the transfer yard, and they paid me up until the time suit was brought."

And the objection to the introduction of the contract was sustained and exception reserved.

Plaintiff offered evidence to the effect:

"At the time I was stopped from hauling the defendants were still cutting timber on the land. They were moving it to market. There were four sawmills on the property, but I don't know if they were all operating at this time; there has been as high as five at one time. The output on an average would be, I suppose, about 50,000 feet per day; when everything was running good it would be much larger. They claimed to have two or three 15,000 to 20,000 mills and one 15,000 to 12,000 mill. Hubert Young wrote this contract.

"Cross-Examination.

"After we quit hauling, they continued to cut lumber on the Ezzell and Seaman tracts. That lumber was not delivered upon the pike at a transfer station and unloaded there. It went through a nearer way."

To this tendency of evidence it was shown:

"All the lumber produced by the Little Bear Sawmills, prior to the alleged breach and the filing of the suit, that was delivered upon the yard on the pike called the transfer yard, was hauled by Mr. Vinson and Mr. Bolton, as far as I know. None of it remains there. I paid them for hauling it. Part of the lumber cut since that time has been marketed in another way over another route. I have never, that I know

of, ordered Mr. Vinson and Mr. Bolton not to haul any lumber from the transfer yard.

"Redirect Examination.

"Question: You no longer use that transfer yard for a transfer yard? Ans.: At the present time we are not using it.

"Question: You are not using it any more? Ans.: Not at the present time.

"Question: The way the controversy came about was in your going out by a more direct route with your lumber, was it, and missing this transfer yard entirely? Ans.: We didn't miss it entirely; we took some up to the upper point.

"Continuing on his redirect examination, the witness testified as follows: 'That was the point Bolton and Vinson had been hauling from. We carried the bulk of our lumber by a more direct route.'"

After this and evidence tending to show further cutting and intermittent conduct of the mills, the hauling of 250,000 feet of lumber by the transfer yard, and the production and hauling of rough lumber by other and more direct route to market, the witness said:

"When we used the reload station that Vinson and Bolton had been hauling from, that necessitated a reload. It cost us under this contract $3.25; the cost to the reload station was $3 I think, I would not say for sure. The cost varies as we are now hauling; it will cost us about $5.25, and cost $6.25 the other way. It makes a difference of $1."

Whereupon plaintiffs again offered the contract in evidence, and objection on the grounds that it was unilateral, the objection being sustained and exception to ruling, the plaintiffs took a nonsuit, etc., because of such adverse ruling. In the opinion of the writer, this contract was within the rule of the case by Mr. Justice Gardner, viz. Lucas E. Moore Stave Co. v. Kennedy, 212 Ala. 193, 101 So. 894, and there was no error in excluding the contract on defendants' due objection. See, also, Hazelhurst Lumber Co. v. Mercantile Lumber & Supply Co. (C. C.) 166 F. 191; Cold Blast, etc., v. Kansas City B. & N. Co. (C. C. A.) 114 F. 77, 57 L. R. A. 696.

Affirmed.

ANDERSON, C. J., and SAYRE and GARDNER, JJ., concur.

BOULDIN, J., concurs in the result.

BROWN, J. (dissenting). The record shows that plaintiffs, on account of the adverse ruling of the trial court in sustaining defendants' objection to the contract, the foundation of the suit, when it was offered as evidence, were forced to take a nonsuit. The record further shows that, at the time the contract was last offered in evidence—it being offered three times—the plaintiffs had not closed their case, and had only examined two witnesses. The ground on which the contract was excluded is that it is a unilateral agree-

ment and imposes no obligation on the defendants. This ruling of the court presents the only question in the case. Priebe v. Southern Ry. Co., 189 Ala. 427, 66 So. 573.

The averments of the complaint and the proof offered show that at the time the contract was entered into the defendants were engaged in the sawmill business, manufacturing lumber for sale on the open market; that they were the owners of large tracts of timber locally known as the Ezzell and Seaman tracts, subject to a time limit for its removal, on which there were 19,000,000 feet of timber, board measure; that they had on these tracts five or more large sawmills, then in operation, some of which they had continued to operate up to the time of the trial; that plaintiffs had hauled under the contract in question over 4,000,000 feet for which defendants had paid them the contract price for hauling. It was also shown that defendants were still in the business of cutting and removing the timber from said tracts, sawing it into lumber, and transporting it to the market; that by adopting a different method of transporting the lumber than that provided in the contract with plaintiffs, the cost was $5.25 per thousand, while it cost $6.25 to move it under the contract with the plaintiffs.

It was also shown that defendants had, in the main, discontinued delivering the lumber to the crossroads relay point as provided in the contract, and had notified the plaintiffs that it would refuse to allow them to continue their hauling operation under the contract.

The pertinent provisions of the contract are as follows:

"(1) The parties of the second part (plaintiffs) hereby agree to haul and deliver to the plant of the first parties (defendants) all of the lumber cut by first parties off of what is known as the Seaman and Ezzell tracts of timber, taking said lumber from the crossroads, on the Russellville and Red Bay road, about thirteen miles from Red Bay, and delivering to plant at Red Bay, taking good care of the lumber and unloading same as instructed by agent of the first parties at the planing mill.

"(2) The price mutually agreed upon by the contracting parties is to be $3.25 per M feet on green lumber, and 50 cents per M less on dry lumber, for the first four million feet. After this amount is hauled there is to be a revision of prices in case lumber has declined as much as $4.00 per M feet or gas and feed has gone up as much as 25 per cent.; there not being a revision of more than 50 cents per M feet either up or down."

The majority opinion affirms the ruling of the trial court holding that the contract is unilateral, for the reason that "there is nothing in the instant contract giving plaintiffs the right to compel the lumber company to (1) cut the timber from the large tracts of land owned by them (Seaman and Ezzell

tracts of 6,000 acres); (2) or to compel them to saw the stock into rough lumber in one of its four or five mills, and deliver it at its 'crossroads' yard or to receive all of its lumber at its planer at Red Bay."

It is a familiar rule, well grounded in reason, that "it is the duty of the courts to lean against the destruction of contracts on the ground of uncertainty." Holst & Co. v. Harmon, 122 Ala. 453, 26 So. 157; Elmore, Quillian & Co. v. Parrish Bros., 170 Ala. 499, 54 So. 203.

"A contract does not lack mutuality merely because every obligation of the one party is not met by an equivalent counter obligation of the other party. * * * Even though the promise of one of the parties to a bilateral contract is not stated expressly therein, such promise is sometimes implied from the nature of the terms of the contract. Frequently it happens that contracts on their face and by their express terms appear to be obligatory on one party only; but in such cases, if it be manifest that it was the intention of the parties and the consideration upon which one party assumed an express obligation that there should be a corresponding and correlative obligation on the other party, such corresponding and correlative obligation will be implied. As if the act to be done by the party binding himself can be done only upon a corresponding act being done or allowed by the other party, an obligation by the latter to do, or allow to be done, the act or thing necessary for the completion of the contract will necessarily be implied." 6 R. C. L. 689, § 95, and authorities there cited in notes 12 to 15; 13 C. J. p. 334, § 180, and authorities cited in note 37; Butler v. Thomson, 92 U. S. 412, 23 L. Ed. 684; Mississippi River Logging Co. v. Robson, 69 F. 773, 16 C. C. A. page 400.

This principle is applicable here. It seems to be conceded that the contract was bilateral and binding on the defendants as to the 4,000,000 feet already cut and transported under the contract, and there is nothing in the evidence showing or tending to show that lumber had declined in price, or that gas had increased in price, necessitating a revision in the contract price for hauling.

It is clear that the timber cut and manufactured into lumber, subsequent to the time the 4,000,000 feet were cut and hauled by the plaintiffs, falls within the same category as the 4,000,000 feet, and, if the contract was binding on the defendants to deliver the 4,000,000 feet at the crossroads relay point, the same obligation applies to all timber subsequently cut and transported, and the obligation to deliver such lumber at the relay point must necessarily follow. Therefore, if it be conceded that the contract imposes no obligation on the defendants to continue the business of cutting and manufacturing the timber into lumber, yet, so long as they elect

to continue in the business of cutting, manufacturing, and transporting, the obligation under the contract to deliver the lumber to the relay point, so that the plaintiffs could comply with their contract, existed, and defendants' failure to do so constituted a breach of the contract.

Moreover, it was shown that some of the lumber cut, subsequent to the notice to plaintiffs to cease their hauling under the contract, was delivered at the crossroads relay point and was moved by parties other than the plaintiffs. No sound reason can be stated why the lumber so delivered at the relay point was not within the contract, and the denial to the plaintiffs of the right to transport it to the delivery point at the planer was a clear breach of the contract.

In Jones v. Lanier, 198 Ala. 363, 73 So. 535, cited in the majority opinion, the appellee had "assumed to take and pay for the entire output of appellant's Baker's Creek mine for nine months at a stipulated price per ton, subject to appellant's coal 'proving entirely satisfactory' to appellee." In that case the court held that the facts pleaded, showing that the coal proved to be unsatisfactory to appellee, authorized the appellee "to rescind the contract as for a lack of performance on plaintiff's part."

In Lucas E. Moore Stave Co. v. Kennedy, 212 Ala. 193, 101 So. 894, there was "an agreement only on the part of Kennedy Bros. to sell at a stipulated price their production for the year 1920 of white oak staves. There was no obligation on their part to produce any staves, but only to sell at the agreed price such staves as they in fact did produce for that year." The court held that "the stave company could not have maintained an action for damages growing out of a breach of such agreement for a failure on the part of Kennedy Bros. to produce any staves during the year 1920"; therefore the contract, in respect to this provision to produce, was wanting in mutuality. If Kennedy Bros. had produced a quantity of staves and the stave company had refused to take the staves at the agreed price, or if Kennedy Bros. had refused to deliver the staves so produced, to the stave company under the contract, the results would have, no doubt, been different.

In Lucas E. Moore Stave Co. v. Woodley, 213 Ala. 570, 105 So. 878, it was held that the contract there involved was—

"unilateral and wanting in mutuality, as there is nothing in it binding or obligating the plaintiffs to do anything—just an agreement of the defendant to take all staves at the price fixed as per classification given within the period fixed."

Other cases cited in the majority opinion are subject to differentiation for reasons patent on their face.

Here the defendants had no title to the lands on which the timber was standing; they only owned the timber, subject to a time limit for its removal, and it cannot be assumed that, when they entered into the contract with the plaintiffs, they intended to abandon their operations, and in fact it appears that they have not. Therefore, so long as they continue to operate, they are obligated, by the contract with plaintiffs, to deliver all lumber manufactured from timber cut off of the named tracts, to the relay point, so that the plaintiffs may perform their part of the contract.

The mere fact that they can move the lumber at less cost gives them no right to rescind or violate the contract, or to deny plaintiffs the right to perform.

The ruling of the court cannot be justified on the theory that the plaintiffs failed to make out a case. When the contract was last excluded, the plaintiffs had not closed their testimony, and the rejection of the contract made it useless for the plaintiffs to proceed further.

Nor can the trial court be sustained on the theory that the complaint does not state a cause of action. The ruling of the trial court was to the contrary, and the correctness of that ruling cannot be questioned on this appeal.

I am therefore of opinion that the court erred in rejecting the contract as evidence, and that the nonsuit should be set aside and the cause remanded for a new trial.

SOMERVILLE, J., concurs in the dissent.