13 So.2d 190

#### COWIN v. SALMON et al.

#### 6 Div. 36.

Supreme Court of Alabama.

March 11, 1943.

Rehearing Denied May 13, 1943.

Wm. S. Pritchard and Horace C. Wilkinson, both of Birmingham, for appellant.

290

Cabaniss & Johnston, of Birmingham, for appellees.

FOSTER, Justice.

Salmon and Cowin had been associated in business for a number of years. It was incorporated as Salmon & Cowin, Inc., Mining Engineers and Contractors, to which we will refer as the Salmon Company, since this was done in the pleadings. Each originally owned separately an equal number of shares.

More recently another corporation was formed known as Mine & Contractors Supply Company, to which we will refer as the Supply Company.

Salmon and Cowin were mining engineers, engaged principally in mine development, such as shaft sinking, also slopes and tunnels. A part of their business was also

that of fabricating and selling steel, bits, mining supplies and related merchandise, to mines and contractors.

They concluded, for what they considered good and sufficient reasons, to separate that feature of their business. This was done by forming said Supply Company. It was accomplished in June and July, 1940, by assigning to them personally certain described assets of the Salmon Company, in consideration of delivering to it an equal specified number of shares of stock in that corporation. They in turn transferred and assigned to the Supply Company that property in payment of their respective subscriptions to its capital stock. Thereby each acquired an equal number of shares in the latter corporation.

The Supply Company was conducted as a separate entity in all its operations. But officers and employees of both companies were the same, and the business of both conducted in the same offices. But before the incorporation of the Supply Company, and on April 9, 1938, Salmon and Cowin entered into a written agreement as follows:

"Stock Purchase Agreement.

"The common stock of Salmon and Cowin, Inc., Min. Eng. & Contr. is paid for as follows, H. S. Salmon, 12,500 shares, P. G. Cowin, 11,500 shares.

"As it is the wish of H. S. Salmon and P. G. Cowin that, at the death of either, the surviving one shall own all the common stock of the company, it is agreed as follows:

"1. That at the death of either one his heirs shall relinquish to the other their interest in the common stock of Salmon & Cowin, Inc.,

"2. That such heirs shall receive as payment for this stock one-half of the last amount agreed upon below as the estimated worth of Salmon & Cowin, Inc., such amount to be arbitrarily set and agreed upon as shall be shown by the signatures of H. S. Salmon and P. G. Cowin.

"Date: Estimated worth Salmon
"April 1, 1938. and Cowin, Inc. $48,-000.00 Agreed upon by H. S. Salmon, and P. G. Cowin.
"_____.
"Witness:
 W. S. Pritchard.
 Maude E. Quarles. and,

"3. That such payment shall be made in cash to the amount of at least $12,000; and the balance shall be in cash to as large an amount as possible or in notes of Salmon and Cowin, Inc., with interest at 6% and with the principal reducible at $1,000 a year or more.

"4. That, if both parties to this agreement shall die within a year, the assets of the company shall be divided equally between the heirs of both; except in cash [case] a cash payment shall already have been made such amount shall be considered part of the equal share of the heirs of that stockholder.

"5. That this agreement be made in triplicate, with copies to H. S. Salmon, P. G. Cowin and Salmon & Cowin, Inc., and can be changed at any time by the signatures of H. S. Salmon and P. G. Cowin on all three copies.

 "H. S. Salmon
 "P. G. Cowin.
"Witness:
"W. S. Pritchard,
"Maude E. Quarles. Date April 9, 1938.

"Insurance Agreement.

"In order that there may be available cash to carry out the above agreements, the following insurance agreement is also made between H. S. Salmon and P. G. Cowin.

"a. That each shall carry an insurance policy on the life of the other to the amount of at least $10,000 and be the beneficiary thereof.

"b. That each shall pay all premiums promptly so that the policy shall not lapse, and benefit by such dividends or cash value as may accrue.

"c. That this agreement shall extend until the death of either.

"d. That at the death of either or at the termination of the Stock Purchase Agreement for any reason, each shall have the right to take over the insurance policy on his own life upon payment to the other of such cash value and dividends as shall have accrued to date.

 "H. S. Salmon
 "P. G. Cowin.
"Witness:
"W. S. Pritchard,
"Maude E. Quarles, Date Apr. 9, 1938.

"These two agreements understood and approved Mildred H. Salmon and H. S. Salmon, Administrator."

292

Salmon died October 14, 1941. The questions chiefly tried were whether the stock purchase feature of that contract had been modified or rescinded by mutual agreement before his death, or, if not, whether it was binding on the estate of Salmon at the suit of Cowin, seeking its enforcement, and a proper interpretation of the insurance contract.

The court found and decreed that the stock purchase feature of the contract had been rescinded by what was in substance a mutual agreement to that effect.

█ In order to reach a proper interpretation of the evidence it is necessary to recall certain principles of law as follows: A written executory contract may be verbally modified or rescinded by mutual agreement, with no other consideration than the mutuality of their agreement to do so. Commercial Credit Co. v. Perkins, 236 Ala. 616, 184 So. 178; Spencer v. Richardson, 234 Ala. 323, 175 So. 278. But to have that effect the minds of the parties must meet upon the fact and terms of the modification to make it binding on either or both. 13 Corpus Juris 591, § 606; 17 C. J.S., Contracts, § 375. And "there must have been an abandonment of the entire contract, and not merely a waiver of some portion of it." Waterman on Specific Performance, § 492.

██ A verbal agreement to execute a contract to be in writing, the terms of which are mutually understood and agreed on, is in all respects as valid and obligatory as the written contract itself would be if executed, when no statute requires it to be in writing, and the agreement does not postpone its effect until the writing is signed. An agreement to enter into a contract upon terms to be afterwards settled between the parties is incomplete on its face, and amounts to nothing. Elmore, Quillan & Co. v. Parrish Bros., 170 Ala. 499, 502, 503, 54 So. 203; Goodwin v. Adler, 220 Ala. 69, 72, 124 So. 108; 5 Ala.Dig., Contracts, p. 97, ☞237(1) and (2).

We find ourselves in disagreement with the trial court in interpreting the evidence in this case, which, though given orally in open court, was without conflict in material respects, and it was such that an observation of the witnesses by the trial judge could not be of material aid in drawing the inferences from it.

We think the evidence shows that Salmon and Cowin agreed that they would modify the contract which we have set out by adding the stock of the Supply Company to be included in the sale and by changing the figures representing the price which could be paid for the stock by the survivor of them, but that they never agreed on such changed figure. We do not think that the intent was to abrogate the contract, and make it inoperative until such changed figure was agreed on. They had had such an agreement continuously in effect for many years prior to the one here mentioned. This superseded any theretofore in existence. It expressly recited that it was to extend until the death of either; and that any change shall be by the signatures of them both on all three copies.

█ While this requirement and stipulation could as well be verbally modified as any other feature of it, there was no expression of an intention to do so. It would not be inferred merely from an expressed intention to modify it in certain respects, and that modification by a new instrument whose terms were never completely agreed on either in writing or verbally. There was nothing to indicate a purpose to abrogate immediately for any short period of time, a policy which they had pursued for many years, and which they certainly did not intend to abandon permanently.

The incorporation of the Supply Company was effected July 2, 1940, after the stock purchase and insurance agreements were entered into. Its stock was owned by Salmon and Cowin personally. It is not a subsidiary of the Salmon Company. The stock purchase agreement only related by express reference to stock in the corporation of the Salmon Company.

Cowin by his cross-bill seeks to have those agreements include stock of the Supply Company based on the same consideration. When the Supply Company was organized about a year before that, it had assets worth $5,000.

While it is evident that there was a purpose to include the stock of both corporations in the combined agreement, it is equally clear that this was not to be done at the old stipulated sum, and that such sum was to be changed. They agreed that a new valuation should be made. The modification cannot be considered as complete to the extent of including only a part of what was proposed, merely because that part was agreed on when it was apparent

that such agreement was to be effective only in event that a new valuation fixing the purchase price should be named.

We cannot make a contract for them either to include the stock of the Supply Company or to fix the purchase price when they did not so agree, though they intended to make a change in both respects.

So that our view of the situation is that the contract relating to the stock sale was not abrogated by mutual agreement but that it does not include the stock in the Supply Company, and that the purchase price named at one-half of $48,000, payable as stipulated, was not changed, though the parties agreed that it should be.

Having reached that conclusion, we must determine whether the contract is to that extent enforceable against Salmon's estate, by declaring a trust in the nature of specific performance.

This suit originated in a bill by the widow of Salmon, making as parties Cowin; the administrator of Salmon, deceased; the Salmon Company; and the Supply Company; and sought a declaratory judgment in respect to the several matters to which we have referred. Cowin, the Salmon Company, and the Supply Company filed an answer and cross-bill with no demurrers to the original bill. They seek specific performance of the stock purchase agreement, whereby Cowin offers to pay the amount of the consideration as provided by the contract and decree of the court, with general prayer and offer to do equity.

The relief sought presents two legal questions now to be considered. (1) Was the contract revoked by Salmon's death, on account of the absence of a consideration sufficient to bind both parties to it? (2) Will a court of equity enforce the contract notwithstanding an alleged mutual understanding that it should be changed on account of altered conditions, but which was never fully thus changed?

Looking at the terms of the contract, we find nothing in it which obligates the survivor to pay the named purchase price. It undertakes to bind the "heirs" of the one who should die first to "relinquish" to the survivor for a certain price "their interest in the common stock of" the Salmon Company. But its terms do not require the survivor to accept a transfer of the stock and pay the stipulated price.

There was no mutuality of contract. McIntyre Lumber & Export Co. v. Jackson, 165 Ala. 268, 51 So. 767, 138 Am.St.Rep. 66; Lucas E. Moore Stave Co. v. Kennedy, 212 Ala. 193, 101 So. 894; Pizitz-Smolian Co-op. Stores v. Meeks, 224 Ala. 330, 140 So. 442; Stewart's v. Redmond, 219 Ala. 365, 122 So. 315; Bentley-Beale, Inc., v. Wesson Oil & Snowdrift Sales Co., 231 Ala. 562, 165 So. 830; Sherrill v. Alabama Appliance Co., 240 Ala. 46, 197 So. 1; Vinson v. Little Bean Sawmills, 216 Ala. 441, 113 So. 385.

We must treat it therefore as an option, wherein the optionee is seeking to enforce it. An option "is neither a sale nor an agreement to sell. It is simply a contract by which the owner of property agrees with another, that he shall have the right to buy the property at a fixed price within a time certain. He does not sell his land; he does not then agree to sell it; but he does then sell something, viz.; the right or privilege to buy at the option or election of the other party. * * * The owner parts with his right to sell his lands (except to the second party) for a limited period. The second party receives * * * the right to elect to buy." Fulenwider v. Rowan, 136 Ala. 287, 34 So. 975, 979. But for such a contract to be irrevocable by the seller, it must be based on a valuable consideration even though nominal. Sherrill v. Alabama Appliance Co., supra; City of Andalusia v. Alabama Utilities Co., 222 Ala. 689, 139 So. 899; Johnston v. Guice, 217 Ala. 27(6), 114 So. 409; Ross v. Parks, 93 Ala. 153, 8 So. 368, 11 L.R.A. 148, 30 Am.St.Rep. 47.

Usually the acceptance of the option and notice to the optionor of an election to purchase on the terms proposed before the option is revoked, makes a binding contract on both parties, and the relation of seller and buyer comes into existence. Fulenwider v. Rowan, supra; 66 Corpus Juris 494, note 69; 58 Corpus Juris 978, note 73.

The death of the optionor before its acceptance is communicated to him by the optionee causes the offer to lapse when unsupported by a consideration. On the other hand, an acceptance before his death is a consideration, and makes it a binding contract. 13 Corpus Juris 298, § 112; 17 C.J.S., Contracts, § 51; 66 Corpus Juris 518, § 51; Groh v. Calloway, 316 Mo. 989, 292 S.W. 65. An option does not lapse at the death of the optionor, if it is

294

supported by a valuable consideration, though it has not then been accepted. 66 Corpus Juris 506, § 30. "If the contract was one the intestate could not have revoked in his lifetime, then his heirs or legal representatives have no greater right." Mueller v. Nortmann, 116 Wis. 468, 93 N.W. 538, 96 Am.St.Rep. 997; Roesser v. National Exchange Bank, 112 Wis. 591, 88 N.W. 618, 56 L.R.A. 174, 88 Am.St.Rep. 979.

The contract here in question is similar in some respects to that treated in Schumaker v. Schmidt, 44 Ala. 454, 4 Am.Rep. 135. There was a mutual agreement signed by two persons in the form of a will but further providing in substance that the survivor shall pay all the expenses of sickness and burial of the other, and "whatever expenses (debts) of the estate shall be due by proof," and shall have the entire estate of the decedent for his sole use and benefit. It is said in that case:

"The disposition of the property is posthumous entirely. No present interest is granted, and no consideration present, or within a reasonable or given time is required. * * *

"Viewed as a contract, the most favorable interpretation of it would be, that each party, by a joint instrument, created in his own property a life estate to himself, with remainder to the other if he survived. The embarrassments attaching to property in this condition, and the evil tendency of secret executory agreements, not to be revealed perhaps, until death had cut off the victim of fraud, make us averse to pronounce this a compact, in the absence of express declaration to that effect, or unavoidable deduction from its terms. * * *

"The will under consideration, though made by two, is not a joint will, because by its terms it can be only the will of him who dies first. The survivor is to take all the property of the other, and no further disposition is made. Though classed under the general denomination of mutual wills, it is not in fact such, because the term implies the will of two persons. It is, therefore, the separate will of the first decedent.

"Is there any thing of the essence of a compact in it which should interfere with its revocability? Can he who dies first, or the survivor, be injured if it be deemed revocable? The first decedent, while he lives, can receive nothing from the other, and his death concludes the operation of the instrument as to any reciprocal or hoped for advantage. On the other hand, if he revokes it, and makes other disposition of his property, the survivor is not injured. This would be the case if only a moment intervened between their deaths, or if they died at the same instant."

 This does not contravene the principle that there may be an executory contract by which at the death of the contractor the contractee may acquire his property on the terms named. But such a contract must be based on a valuable consideration, irrespective of the channel by which the property may be acquired. The fact that it shall be operative at the death of the contractor, and is only binding on his heirs, does not militate against it, if otherwise valid. It may be set up as a promise to make a will. It will then be operative to create a trust on his estate in the hands of his heirs, if no such will is executed or is revoked; but only when there is a valuable consideration for the contract to make the will. Manning v. Pippin, 86 Ala. 357, 5 So. 572, 11 Am.St. Rep. 46; Allen v. Bromberg, 147 Ala. 317, 41 So. 771; Walker v. Yarbrough, 200 Ala. 458, 76 So. 390; Cox v. Hutto, 216 Ala. 232, 113 So. 40; Hendrix v. Pigue, 237 Ala. 49, 185 So. 390; Wagar v. Mashburn, 241 Ala. 73, 1 So.2d 303. It has been held by this Court that there is no authority to revoke a contract by one who for a valuable consideration bound his estate to another operative at death. Walker v. Yarbrough, supra, on rehearing page 461 of 200 Ala., page 393 of 76 So.; Cox v. Hutto, supra.

 A will as such is revocable. But when it is the result of a contract on a valuable consideration, the revocation of the will does not prevent the enforcement of a trust upon the basis of its obligation. It is not a question of making a contract for his heirs, but one of creating a trust enforceable against his heirs. Bolman v. Overall, 80 Ala. 45, 2 So. 624, 60 Am.Rep. 107. And the particular form of the contract is not controlling in equity. Here the stipulation is that his "heirs will relinquish." That clearly imports a declaration of purpose to have the survivor invested with a right in rem enforceable against his heirs. But what did the survivor pay for such a right? It was pointed out in Schumaker v. Schmidt, supra, that the survivor there gave no consideration. To a like effect is Canada v. Ihmsen, 33 Wyo. 439, 2?0 P. 927, 43 A.L.R. 1010. There seems

to be some difference of opinion on this point. See Stewart v. Todd, 190 Iowa 283, 173 N.W. 619, 180 N.W. 146, 20 A.L.R. 1272.

But if each had agreed that the one of them who should be the survivor becomes thereby obligated to pay the stipulated price to the heirs and representatives of the decedent, who are likewise to be bound, their mutual obligation to create the relation of seller and purchaser, respectively, dependent upon which shall die first, would create a consideration each to the other, thereby establishing an executory trust in favor of the survivor and against the estate of the decedent, in the nature of a contract to buy and sell. In the Schumaker case, supra, it was noted, as we have shown, that in the absence of an express declaration that there was a compact, or an unavoidable deduction from its terms to that effect, it would not be so treated. The terms of the instrument there considered look more like a compact than those here involved.

We need not for present purposes make a restudy of the principle of the Schumaker case, supra, since it is not controlling when there is in the transaction a valuable consideration otherwise.

The insurance agreement, we think, furnishes that consideration. It was executed at the same time, physically attached to the other, and referred to it. They should be treated as a single contract. It stipulated that each "shall carry an insurance policy on the life of the other to the amount of at least $10,000, and be the beneficiary thereof, and pay the premiums so that the policy shall not lapse." Each was not only the beneficiary in such policy, but had an option right in the other policy on certain conditions. But each bound himself irrevocably as to the insurance, and each in fact carried out that obligation. The expressed purpose was to provide a fund to be available to carry out the stock purchase feature of the agreement. So that the obligation of each to carry the insurance in which the other had a contingent interest, and the duty to keep up the policy, all of which was done, was a consideration which was a part of the stock purchase feature of the agreement.

We find ourselves with an unrescinded option agreement whereby a trust on the stock of the decedent in the Salmon Company was attempted to be created for a valuable consideration on the condition that the survivor shall pay to the representatives of the decedent the sum of $24,000. That is the agreement which Cowin is seeking by his cross-bill now to specifically enforce.

Ordinarily a court of equity will not refuse to enforce a contract, if it was fair and reasonable when made, but has become unconscionable or inequitable in consequence of the happening of (even sometimes) unexpected events, for the parties will be considered as having taken upon themselves the risk of subsequent fluctuations in the value of the property, which will not prevent specific performance, unless such changed condition was due to the conduct of the party who seeks the performance. Homan v. Stewart, 103 Ala. 644, 16 So. 35; Blackburn v. McLaughlin, 202 Ala. 434, 80 So. 818.

But "the court exercises discretion in granting or withholding a decree of specific performance, neither party being entitled to it as a matter of right. It is not a discretion which will be arbitrarily or capriciously exercised, but a sound, judicial discretion, controlled by fixed rules and principles, in view of the special features and incidents of each case." Homan v. Stewart, supra [103 Ala. 644, 16 So. 36]. Some of those rules are thus stated: "The court may refuse to enforce an agreement which yet cannot be regarded as rescinded." Waterman on Specific Performance, § 494. "An oral modification in favor of defendant, even though it may not be enforceable because of the statute of frauds, may be set up as a bar to specific performance." 58 Corpus Juris 980, § 164, note 85, p. 981, § 165, note 93; Waterman on Specific Performance, § 489.

The court seemed to have been of the opinion that the present value of the stock of both corporation and of either of them was not material to the present inquiry. While there is some casual reference in the evidence to a net value of the combined corporation, as shown by the combined balance sheet, it is apparent that there was no issue tried on that question. On the other hand, Cowin claims that the circumstances show a division of all the profits each year and no opportunity for an appreciable increase in value. Whereas there could have been such increase occasioned

by an enhancement in the value of its assets as manifested by the inventory in evidence. But in view of the rulings and declarations of the trial judge, we do not think it would be appropriate to accept as proven any material enhancement in the value of the property. That must be left out of consideration on this subject.

In the event it be clearly proven that such value had increased to $112,000, as appellee contends, that circumstance alone would not be sufficient justification for withholding specific performance. But it would be material as a circumstance to illustrate and shed light on the meaning of the discussions of the two men in respect to a change in the stock purchase agreement.

The Supply Company and the Salmon Company were intimately associated. They apparently thought the ownership of them both should be combined in the survivor. They were apparently integral features of their business, taken as a whole. The stock purchase agreement did not include that of the Supply Company, but they both agreed that it should be so altered as to include it but not at the old stipulated price.

We think that it would be a sound exercise of an equitable discretion to decline to specifically enforce an agreement which it was apparent both parties did not wish to have enforced as then set up.

That is exactly what we have here. Both parties thought the ownership of the entire business should be vested in the survivor of them, not that ownership of a part of it should be so. But the contract as then set up only included a part of it, and they were negotiating a modification so as to include it all, and had agreed that it all should be included, but not at the old stipulated price. If we hold that equity should enforce the agreement as it then stood, limited to the Salmon Company, then Cowin could enforce the sale to him only of the stock in the Salmon Company, leaving the Supply Company jointly owned. This they did not want to exist as was manifest. It would necessitate either a continuance of the business whose ownership was thus split, or a dissolution of the Supply Company, and division of its assets, or a negotiated sale to Cowin of the Salmon interest in the Supply Company.

The contract provided in a certain contingency that the business should be dissolved and its assets divided (paragraph 4 of the contract). This business was a combination of professional men, engaged in pursuing their profession. They saw fit to incorporate it. Had it been a partnership, the death of one would have caused a dissolution and division of its assets. The survivor could pursue his profession alone. We think the evidence shows that the parties preferred that such course should be pursued unless the entire business came within the terms of the stock purchase agreement. They were negotiating its accomplishment, when death of Salmon stopped them in the effort. But that did not alter what was a clear purpose and intent that it should be done upon some basis not then agreed on. For a court of equity to enforce the agreement as to the Salmon Company, not including the Supply Company, or to include the Supply Company at the old price, or to fix a reasonable price to which they had not agreed, would do violence, in any of those contingencies, to the intent and purpose of the parties. We therefore agree with the trial court that specific performance should be denied Cowin.

### The Insurance Contract.

The insurance feature of the contract has been set out with the balance of it in this opinion. Its interpretation and not its validity is here questioned. Literally, it seems to stipulate in one aspect that on the death of either party (as well as at the termination of the stock purchase agreement) each of them shall have the right to take over the policy on his own life upon payment to the other of such cash value and dividends as shall have then accrued. Does that mean that this right exists in the dead man's representative? The contention is that this means that at the death of Salmon, when $10,000 became payable to Cowin under the policy whose premiums Cowin had paid through the years, Salmon's representatives could pay Cowin the amount of the cash value and dividends which had then accrued, and take over from him the $10,000 which became due when Salmon died. This construction seems to us not to be expressive of their intention. But we think it meant to confer a right to take over a live continuing policy of insurance, not one on which the liability had fully matured; that the right of election was conferred on a living man, not the representatives of the dead. We

think it meant to confer on the survivor the right to take over the policy on his life which had been carried by the deceased, by paying to the estate of the deceased the amount of its surrender value and accrued dividends. Cowin had been paying the premiums all the time on the policy insuring the life of Salmon, and was named in it as beneficiary, and for which, on the death of the insured, he would receive, according to Salmon's contention only the cash value and accrued dividends.

We cannot assume that they meant that. It could well be construed to give such option to the survivor, and that is our interpretation of it.

The result is that we cannot agree with the trial court in declaration No. 1 of the decree, but we hold that the stock purchase agreement was not abandoned by mutual agreement prior to the death of Salmon. Declaration No. 2 does not seem to be controverted if the complainant shall be held not to be obligated to relinquish the stock of the two corporations. Since we hold that she is not so obligated, that declaration need not be disturbed. Declaration No. 3 we think is without error in its conclusion, but we do not agree with the reason assigned for that conclusion. So that the result there declared will not be disturbed. Declaration No. 4 in substance declares that Salmon's administrator may pay to Cowin the cash surrender value and accrued dividends on the Policy No. 6450326 in the Prudential Life Insurance Company upon the life of Salmon, payable to Cowin, and receive from Cowin the proceeds of it collected by him.

To this extent we cannot agree with declaration No. 4, and hold that Salmon's administrator has no such right. That declaration also gives to Cowin the right to pay to the administrator of Salmon the cash value and accrued dividends on the policy No. K-260649, issued by the United States Government upon the life of Cowin. To that extent we approve declaration No. 4.

Declarations 5 and 6 are governed by what we have said of declaration No. 4 as to the policy on the life of Salmon. We cannot concur in either of them.

Modified and affirmed.

GARDNER, C. J., and BOULDIN and LAWSON, JJ., concur.