[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 245 
This is a contract case. Alvin Cagle, a potato farmer, entered into a written agreement to purchase seed potatoes from H.C. Schmieding Produce Company, Inc. ("Schmieding"). According to the terms of this contract, Cagle was to immediately pay a portion of the purchase price of the seed potatoes to Schmieding; the balance was to be paid when the crop of potatoes to be raised from the seed potatoes was harvested. According to the record, this contract was entered into on March 6, 1985. Although Cagle paid the pre-harvest portion of the price for the seed potatoes and proceeded to cultivate them, he failed to harvest most of the resulting crop or to pay most of the post-harvest portion of the purchase price. Consequently, Schmieding sued Cagle for the breach of this contract.
Cagle initially responded to this suit by filing an answer and a counterclaim alleging fraud and misrepresentation on the part of Schmieding. The essence of these claims was that Schmieding had misrepresented an intention to enter into a second contract that was to have obligated Schmieding to purchase the crop resulting from the seed potatoes. Cagle also alleged that Schmieding misrepresented an intention to execute a second written contract document reciting the terms of this additional agreement. Cagle later amended this counterclaim to include the additional claim that the contract to purchase his potato crop had in fact been entered into and had been breached by Schmieding, notwithstanding the fact that no formal memorandum of this second contract was actually executed by either party.
According to Cagle, this second contract arose in part from at least two telephone conversations with Schmieding's employees, one of which occurred at the end of February 1985, and one of which took place in May 1985. Cagle introduced evidence at trial to the effect that Schmieding had agreed in these conversations to pay Cagle $5.50 per bag for approximately 10,000 bags of white potatoes and to pay him the market price at harvest time for all of his red potatoes grown on 30 acres of land. In support of this contract, Cagle also introduced a letter addressed to him from Schmieding containing, in pertinent part, the following language:
 "Your potato harvest season is just around the corner. We are looking forward to working with you on the shipment of your crop.
". . .
 "Please give us a week notice before you are ready to ship, in order for us to prepare our sales orders. I have enclosed our business card for your reference. Give us a call, if you have any questions.
 "Sincerely, "L.H. Schmieding /s/ "L.H. Schmieding"
This letter was dated May 26, 1985.
Schmieding denied the existence of this alleged contract and refused to pay Cagle for his potato crop at harvest time. As a consequence, Cagle claimed, he could not pay the balance due on his seed contract with Schmieding. In short, Cagle essentially claimed at trial that his failure to harvest the potatoes and to pay Schmieding resulted not from a unilateral breach of the seed contract on his part, but primarily from Schmieding's breach of the alleged second or collateral contract with Cagle in which Schmieding had agreed to purchase Cagle's resulting potato crop.
The case was tried before a jury. At the close of the evidence, the trial court directed a verdict in favor of Schmieding and against Cagle as to Schmieding's claim regarding the contract for the seed potatoes. Likewise, the trial court also directed a verdict in favor of Schmieding and against Cagle as to Cagle's claims of fraud and misrepresentation. The trial court, however, *Page 246 
submitted to the jury Cagle's contract claim regarding the purchase of the potato crop, and the jury found in favor of Cagle, awarding him compensatory damages for the breach of this contract.
The trial court subsequently denied Schmieding's various post-trial motions, including a motion for J.N.O.V. or a new trial, and entered a judgment based on the jury's verdict. Schmieding appeals, arguing that the trial court erred in submitting the contract claim to the jury and that it improperly dealt with an allegedly prejudicial remark made in closing argument by Cagle's counsel. On brief, Cagle also purports to have cross-appealed, arguing that the trial court improperly disposed of his claims for fraud and misrepresentation. We affirm the judgment of the trial court in all respects.
 I. The Contract Claim
Schmieding argues on this appeal that Cagle's contract claim was improperly submitted to the jury, either because there was insufficient evidence of the existence of such a contract to justify the jury's consideration of the claim, or because the claim was due to be otherwise denied as a matter of law.
We have summarized the applicable standard of review in regard to Schmieding's evidentiary challenges as follows:
 " 'A motion for directed verdict or JNOV is tested against the scintilla rule, which requires that a question go to the jury "if the evidence or any reasonable inference arising therefrom, furnishes [so much as] a mere gleam, glimmer, spark, the least particle, the smallest trace, or a scintilla in support of the theory of the complaint." Alabama Power Co. v. Taylor, 293 Ala. 484, 306 So.2d 236 (1975). In reviewing a trial court's ruling on these motions, the appellate court, guided by the standard of the scintilla rule, determines whether there was sufficient evidence below to produce a conflict warranting jury consideration. Baker v. Chastain, 389 So.2d 932 (Ala. 1980). Like the trial court, the appellate court must view all the evidence in a light most favorable to the non-moving party. Ritch v. Waldrop, 428 So.2d 1 (Ala. 1982).' "
Peete v. Blackwell, 504 So.2d 222, 224 (Ala. 1986) (quotingHammond v. City of Gadsden, 493 So.2d 1374, 1376 (Ala. 1986)). Naturally, we review any rulings purely on matters of law without any presumption of correctness on the part of the trial court.
Schmieding makes three primary arguments to show that the trial court erred in submitting the contract claim to the jury: 1) that the formation of the alleged contract was prevented because the parties intended not to be bound until execution of a formal written memorandum of their agreement, a memorandum that was never in fact executed; 2) that any evidence in support of the alleged contract is barred by the parol evidence rule; and 3) that the alleged contract, assuming that it was in fact entered into, was so indefinite that it was unenforceable as a matter of law. We will address each of these contentions in turn.
We note initially, however, that this transaction is governed by the Uniform Commercial Code as adopted in Alabama. A contract for the sale of potatoes to be harvested is manifestly a "transaction in goods," Ala. Code (1975), § 7-2-102, and we will therefore apply the UCC to the issues presented in this case. Ala. Code 1975, § 7-2-105(1) (" 'Goods' also includes . . . growing crops"); id., § 7-2-107(2).
 A. Intention Not to Be Bound until Execution of Subsequent Writing
Although the issue is controlled by the UCC, we can discern no provision of the UCC precisely applicable to the issue of when the formation of a contract will be delayed until the execution of a subsequent writing. Accordingly, the UCC is to be "supplemented" by the applicable principles of law and equity. See Ala. Code (1975), § 7-1-103.
In Alabama, "[a] verbal agreement to execute a contract to be in writing, the terms of which are mutually understood and agreed on, is in all respects as valid and obligatory as the written contract itself would be if executed, when no statute requires *Page 247 
it to be in writing,[1] and the agreement does not postpone its effect until the writing is signed." Cowin v. Salmon, 244 Ala. 285,292, 13 So.2d 190, 195 (1943). Whether the agreement "postpone[s] its effect until the writing is signed" is manifestly a question of the intent of the parties and is to be "determined by the surrounding facts and circumstances of each particular case." 17 Am.Jur.2d Contracts § 29, at 366 (1964).
Although there is substantial evidence to the contrary,[2] there is at least a scintilla of evidence that the parties intended to be bound to the terms of the alleged contract regardless of the execution of a subsequent formal writing. For instance, the letter noted previously, though perhaps susceptible to varying interpretations,[3] presents at least a scintilla of evidence that the parties, and most particularly Schmieding, regarded their "agreement" as a binding one, regardless of the fact that no formal memorandum establishing the precise terms of the agreement had in fact been executed.
Under the applicable standard of review, therefore, we cannot say that the trial court erred in placing this issue before the jury.
 B. The Parol Evidence Rule
Schmieding also argues that any evidence of the alleged contract for the purchase of Cagle's potatoes is barred by the parol evidence rule. Schmieding points out that the initial telephone negotiations regarding that alleged contract took place prior to the execution of the written seed contract, which was on March 6, 1985. Schmieding argues that, under the parol evidence rule, such prior negotiations must be barred from the jury's consideration because the parties had reduced their agreement to a writing.
This case is controlled by the UCC's version of the parol evidence rule as set forth in Ala. Code (1975), § 7-2-202. In regard to the interpretation of a written contract intended as a "final expression of [the] agreement," this section bars only evidence of agreements entered into prior to (and, as to oral agreements, those made contemporaneously with) the execution of the writing. Like the rule at common law, therefore, this section has no operation where the separate agreements are madesubsequent to the execution of the writing. While it is true in this case that some negotiations as to the potato sales contract may have taken place prior to the issuance of the written seed contract, evidence was also introduced to the effect that those negotiations were renewed and resulted in an agreement sometime after March 6, 1985. In particular, Cagle testified that a Schmieding employee called him in May 1985 to reopen the potato sales contract negotiations on the terms they had discussed previously, and it is undisputed that Schmieding also sent Cagle the previously noted letter indicating the existence of the sales contract well after the seed contract was executed. The parol evidence rule does not bar the introduction of such subsequent agreements, and thus did not bar the evidence of the potato sales contract. *Page 248 
 C. Indefiniteness
Schmieding also argues that, assuming a potato sales contract of some form was in fact entered into, that contract is nevertheless unenforceable because its terms are indefinite. We disagree.
Citing our case of Smith v. Chickamauga Cedar Co., 263 Ala. 245, 82 So.2d 200 (1955), Schmieding argues that the alleged contract fails for indefiniteness due to its numerous "open terms," such as time and place of delivery and various warranties that the potatoes would meet certain specifications. In addition, Schmieding also argues that the price term for the red potatoes, i.e., "market price at time of harvest," is also too indefinite to allow enforcement of the contract.
Although Schmieding's argument might have had some merit under Smith and other pre-UCC cases, this argument has no chance of success on these facts under the UCC. The controlling section in this regard is Ala. Code (1975), § 7-2-204(3), which provides as follows:
 "Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."
We have previously noted that evidence was presented at trial indicating that at least the following terms were agreed upon: 1) the type of potatoes ordered (red potatoes and white potatoes), 2) the quantity ordered (in terms of "bags" or acreage), 3) the price to be paid for the quantity ordered ($5.50 per bag for the whites, market price at harvest for the reds), and 4) the approximate delivery date (at harvest).
This evidence, as well as that noted in our previous discussion, puts to rest any argument as to whether, under the first prong of the test in § 7-2-204(3), the parties "intended to make a contract" — sufficient evidence was introduced by Cagle to require that this question of fact be submitted to the jury.
Similarly, these terms, if in fact entered into, would also provide a "reasonably certain basis for giving an appropriate remedy." Thus, the legal question posed by the second prong of § 7-2-204(3) must also be answered in the affirmative. The alleged contract clearly delineates a promise to sell identifiable goods of a specified type and quantity at a specified or reasonably determinable price and time. Consequently, we think the value of this contract to either party is susceptible to reasonably certain measurement by a court and jury, and that an appropriate remedy for its breach could be provided.
Accordingly, even though the contract contains several open terms in addition to those expressly noted, the contract does not fail for indefiniteness, because such open terms may be supplemented by the UCC's "gap-filler" provisions. For instance, time, place, and manner of delivery are dealt with inAla. Code (1975), §§ 7-2-307, -308, -309, and, similarly, the quality of the potatoes would likely have been guaranteed under one or more of the Code's warranty provisions, see Ala. Code
(1975), §§ 7-2-313, -314, -315. Moreover, a market-based open price term (such as that chosen for the red potatoes in the instant contract) is expressly recognized by the Code as an acceptable contract term, see Ala. Code (1975), § 7-2-305(1)(c). Accordingly, Schmieding's argument that the terms of this contract are indefinite is without merit, and the trial court did not err in submitting this claim to the jury. See also RoyBuckner Chevrolet, Inc. v. Cagle, 418 So.2d 878 (Ala. 1982);Comeq, Inc. v. Mitternight Boiler Works Inc., 456 So.2d 264
(Ala. 1984).
 II. Improper Argument
Schmieding contends also that the trial court failed to properly limit an allegedly prejudicial remark made by Cagle's counsel in closing argument. Suffice it to say that our examination of that remark, in the context of the entire trial, reveals that no substantial prejudice could have resulted from it. See Rule 45, Ala.R.App.P.; Walker v. Cardwell,348 So.2d 1049 (Ala. 1977).
 III. Cagle's Claims of Fraud and Misrepresentation (the Cross-Appeal)
Cagle argues that the trial court incorrectly granted a directed verdict against his *Page 249 
claims of fraud and misrepresentation. We disagree.
As was noted previously, Cagle claims to have raised this issue by way of a cross-appeal.[4] An examination of the record, however, reveals that, although notice of this appeal was filed by Cagle in the trial court, this notice of appeal was not transmitted to this Court as prescribed in Rule 12, Ala.R.App.P., nor was the docket fee paid for the appeal. Therefore, although the appeal was taken at the time the notice of appeal was filed in the trial court (invoking this Court's jurisdiction pursuant to Rules 3(a)(1) and 4(a)(1), Ala.R.App.P.; see Finch v. Finch, 468 So.2d 151 (Ala. 1985)), the appeal was never actually docketed in this Court. Accordingly, this cross-appeal is subject to dismissal under Rule 2(a)(2)(D), Ala.R.App.P., because the failure to pay the docket fee and to otherwise assure the docketing of the appeal constitutes a failure "to comply substantially with these rules." Id.
We choose, however, to overlook this non-jurisdictional defect and to treat the cross-appeal as though it were properly before us, even though it clearly is not. See Rule 2(b), Ala.R.App.P. Our decision to do so is based on the facts that the argument advanced on the cross-appeal is meritless and that no legitimate purpose could be served by further delaying our decision. Delay would be unavoidable, because dismissal pursuant to Rule 2(a)(2)(D) for failure to comply with the rules is not absolute, as is a dismissal for lack of jurisdiction. Instead, the Court must generally allow the defaulting party an opportunity to correct the defect. We cannot, however, justify in this case the waste of time and energy that would be necessitated by a strict application of this rule, when it is clear that the cross-appeal would have no merit were it properly before us. Accordingly, we will ignore the docketing requirements in this case and will consider the issue raised in the cross-appeal — whether the trial court properly directed a verdict foreclosing Cagle's claims of fraud and misrepresentation.
The essence of these claims is that Schmieding misrepresented an intention to perform certain future acts — to purchase the resulting potato crop and to execute a written and binding memorandum of this "agreement" to purchase Cagle's potatoes. Although we have recognized that such fraud claims relating to future acts can be stated, the plaintiff bears the burden of proving both the defendant's present intention to deceive and his intention not to perform the promised future act. Although the question of this intent may be presented to the jury by a scintilla of supporting circumstantial evidence, the evidence must fairly and reasonably allow the inference of the required fraudulent intent, and the mere fact that the promised future act was not performed will not, of itself, provide the scintilla of evidence required to defeat a motion for directed verdict. Russellville Production Credit Association v. Frost,484 So.2d 1084 (Ala. 1986). To hold otherwise would convert all traditional contract claims to fraud actions, an intolerable result. See id.
In the instant case, our review of the record convinces us that there is no evidence supporting Cagle's claims of fraud or misrepresentation.
 IV. Conclusion
The judgment is affirmed as to all matters presented in these appeals.
AFFIRMED.
TORBERT, C.J., and MADDOX, ALMON and BEATTY, JJ., concur.
[1] The UCC statute of frauds, Ala. Code (1975), § 7-2-201, is not raised as an issue on this appeal, nor do we find any place in the record where this affirmative defense was pleaded. Accordingly, even if it might have been applicable, the defense is not before us. See Hughes v. Wallace, 429 So.2d 981
(Ala. 1983); Engel Mortgage Co., Inc. v. Triple K Lumber Co.,Inc., 56 Ala. App. 337, 321 So.2d 679 (1975).
[2] Schmieding notes that all parties and numerous witnesses, including Cagle, testified that the industry practice was that such contracts were normally in writing. Other evidence, such as the size of the contract, also indicates that the contract was conditioned upon execution of the writing. See generally E. Farnsworth, Contracts § 3.8, at 120-21 (1982).
That reasonable men might differ, however, as to whether the contract was in fact to be delayed until issuance of a subsequent writing is not determinative of the question before us. We are asked on this appeal only whether the trial court correctly sent the issue to the jury, a question of the sufficiency, and not the weight, of the evidence, and hence measured by the scintilla rule.
[3] Schmieding presented evidence that this letter was sent to 90% of the farmers in Cagle's area and was nothing more than a generalized solicitation for open-market potato business. Its language, however, is fairly susceptible of the meaning Cagle asserted it had — an assent to the terms of an agreement to buy Cagle's potatoes.
[4] This issue, raising as it does the correctness of a judgmentadverse to Cagle, is properly raised by way of a cross-appeal, because Cagle is clearly " 'attack[ing] the decree with a view . . . to enlarging his own rights thereunder.' " 9 J. Moore 
B. Ward, Moore's Federal Practice Par. 204.11[2] (2d ed. 1985) (quoting United States v. American Railway Express Co.,265 U.S. 425, 435, 44 S.Ct. 560, 563-64, 68 L.Ed. 1087 (1924)),quoted as controlling in McMillan, Ltd. v. Warrior Drilling Eng'g Co., 512 So.2d 14, 25 (Ala. 1986) (opinion on application for rehearing). *Page 910