# Tombigbee Valley R. R. Co. v. Fairford Lumber Co.

### Bill for Specific Performance.

(Decided May 14, 1908.    Rehearing denied June 18, 1908.    47 South. 88.)

1. *Specific Performance; Mutuality of Remedy; Reciprocal Obligation.*—A contract involving reciprocity of obligation and duty will not be specifically enforced in favor of a party to it who has not performed and who cannot be compelled to perform and who is not capable of performing.

2. *Same; Contracts Enforceable; Continuous Acts During Long Periods.*—Contracts for a succession of acts, the performance of which cannot be consummated by one transaction but must be protracted, and which require continued supervision with the exercise of special knowledge, skill or judgment, cannot, as a rule, be specifically enforced.

3. *Same; Contracts Enforcible in Entirety.*—A contract that can be specifically enforced must be such as can be enforced in its entirety; a partial enforcement cannot be had.

4. *Same; Status to Determine Enforcement.*—A contract must be considered with reference to the status existing at the time of its execution, and not in view of subsequent conditions, in determining whether it is specifically enforceable.

5. *Same.*—The contract in this case considered and it is held to require such a succession of acts requiring protracted supervision that it is incapable of being specifically enforced against complainant's predecessor, and hence, specific performance by the successor of the other party to the contract cannot be enforced in favor of complainant.

APPEAL from Mobile Chancery Court.

Heard before Hon. THOMAS H. SMITH.

Bill by the Fairford Lumber Company against the Tombigbee Valley Railroad Company for specific per-formance of a contract. From a decree overruling a motion to dismiss the bill for want of equity, respondent appeals. Reversed and rendered.

The Tombigbee Lumber Company, by its owners, entered into a contractual agreement with John T. Cochrane, on behalf of himself and his associates, which will be later set out. Afterwards the Tombigbee Lumber Company sold and assigned its property and the rights under the contract above mentioned to one A. S. Terrill, who in turn conveyed it to the present plaintiffs, the Fairford Lumber Company. The contract sought to be specifically enforced is as follows:

"This agreement, made and entered into this 1st day of October, 1903, by and between John T. Cochran, on behalf of himself and associates, and Henry C. Flowers and Frank Hagerman, for themselves and their associates, witnesseth: Whereas, the second parties own or control all of the stock of the Tombigbee Lumber Company, which is the owner of the stocks and bonds of the Tombigbee & Northern Railway Company, which owns and operates the line of railway in Washington county, Ala., and the first party owns or controls all of the stock of the Carrollton Short Line Railway, which owns and operates a line of railway in Pickens county, Ala.; and whereas, the parties are desirous of making a contract as hereinafter set forth: Now, therefore, in consideration of the premises and the covenants herein made it is hereby agreed:

"(1) The first party shall, on or before the 1st day of April, 1904, cause to be organized under the laws of Alabama a railroad company (herein called the 'New Company') with a capital stock of one hundred and fifty thousand dollars ($150,000.00), which shall not

be increased and he shall cause to be issued by said new company one hundred and fifty thousand dollars $150,000.00) of first mortgage bonds, there being one hundred and fifty (150) bonds of one thousand dollars ($1,000.00) each, payable at the Fidelity Trust Company, at Kansas City, Mo., thirty (30) years after date, with five per cent. (5 per cent) annual interest, payable semi-annually, redeemable at any interest-paying date at par plus five per cent. (5 per cent) of the principal—default for ninety (90) days in the payment of interest shall cause principal to become due—secured by the first mortgage upon all of its property then owned or thereafter to be acquired. This mortgage shall name some one designated by second parties as mortgagee, and be in general form like that now on the Tombigbee & Northern Railway, and shall be a first lien on the ten mile extension to be made. If such New Company be so organized, and said bonds and stock issued by that date (time being of the essence of this contract), then the second parties will cause the Tombigbee & Northern Railway Company to sell all its property to said New Company upon these conditions precedent: (2) The Tombigbee & Northern Railway Company shall, on or before the 1st day of April, 1904, in all its parts, without any cost or expense to it, be by the first party standardized so as to be charged from a narrow to a standard gauge railroad in good condition for operation, but the actual work of changing the rails shall not be done until all the work of strengthening the bridges and changing the grades and embankments, where such changes are needed, shall have been first done, leaving the changing of the rails as practically the last work. (b) The five (5) narrow-gauge engines and fifty-seven (57) narrow-gauge log cars of the Tombigbee & Northern Railway Company,

37 C

which it now has on hand, on or before the 1st day of April 1904, without cost or expense to it, be by the first party exchanged for three (3) standard-gauge engines and twenty (20) suitable standard-gauge log cars, and standard-gauge trucks shall by the first party be put under all the other narrow-gauge cars in the service needed on the road as standardized. This change of equipment shall not be actually made until the time when the rails are laid, so as to make a standard-gauge road; the purpose being to have the road out of operation for as short time as reasonably practicable. (c) When the Tombigbee & Northern Railway Company is thus standardized (if done within the time fixed, time being the essence of the contract) without cost or expense to it, the second parties will cause, in consideration of one hundred and fifty thousand dollars of stock and one hundred and fifty thousand dollars of bonds of the New Company to be organized as hereinbefore stated, to be executed by the Tombigbee & Northern Railway Company a deed conveying the New Company all of the property of the Tombigbee & Northern Railway Company free and clear of mortgage or judgment lien now or hereafter existing on any cause of action arising prior to October 1, 1907. The first party shall cause the New Company, on or before October 1, 1905, to extend the Tombigbee & Northern Railway with standard-gauge main tracks at least ten (10) miles from its present terminus, passing through the lands of the Tombigbee Lumber Company, so far as they extend, in a generally northerly direction towards Healing Springs, Ala., or its vicinity, as the then conditions may seem best to the corporate authorities of the New Company; but this extension shall be made from time to time as fast as needed by the wants of the Tombigbee Lumber Company, its successors and assigns. If this extension is

made by said New Company by October 1, 1905 (time being the essence of the agreement), the Tombigbee & Northern Railway Company will transfer and deliver the one hundred and fifty thousand dollars of stock of the New Company to such person as may be designated by the first prty, in consideration of his causing said extension of ten (10) miles to be constructed by said New Company.

"(2) So long as second parties own or control it, and so long as the first party has complied with the conditions of this contract, the second parties will cause the Tombigbee Lumber Company to keep its mill in operation and also to grant to the New Company such rights of way as may be required by said New Company for extension of main line through the lands of the lumber company without any charge or consideration for such conveyance or right of way other than the mutual covenants and agreements herein contained. The Tombigbee Lumber Company is the owner of fifty thousand dollars ($50,000.00) of bonds of the Tombigbee & Northern Railway Company, and the second parties shall cause it, when the transfer of the railroad property to the New Company is made, to cancel said bonds and cause to be released the mortgage securing the same. The Tombigbee Lumber Company shall furnish the roadbed, right of way, and lay the ties ready for the rails upon spurs to be built to and through the lands whereon no timber has been cut, in consideration of the date of this contract; and the first party shall cause the New Company, its successors and assigns, from the date when it acquires the railroad property, to charge the Tombigbee Lumber Company, its successors and assigns, for hauling its logs and lumber prices not to exceed those stated in Schedule A hereto attached and made a part hereof, which schedule of charge shall remain in force

for ten (10) years next after the date hereof, as needed, and, as needed, build spur railroad tracks to and through the land of the lumber company whereon no timber has been cut, furnishing the rails, fastenings, and spikes, and laying the track. Not more than six (6) miles of rails shall be in said spur tracks at any one time. The railroad company shall not take up any spur until the timber adjacent thereto has been removed by the lumber company; but the lumber company must not consume an unreasonable time in so removing such timber. So long as all condittions hereof are complied with, the second parties agree to cause the Tombigbee Lumber Company to allow the New Company to use whatever dead and down timber it may require for bridge and crosstie purposes at three cents per tie, and to permit standing timber to be cut by the New Company only in case of necessity for use of its road in its maintenance and extension, the price of four cents per tie to be paid therefor, and permit the New Company to use for fuel pine knote and limbs and any down stuff not suitable to make ties or lumber, without charge therefor.

"(3) In order to facilitate the work contemplated by this contract, the second parties shall cause the Tombigbee & Northern Railroad Company to immediately appoint John T. Cochrane as its general manager, and as such give him charge and absolute authority over the operation and management of the business of the company and control of its finances, provided he shall not create any new debits against the Tombigbee & Northern Railroad Company or its property. During his incumbency he shall pay all operating expenses, repairs, and maintenance incurred by him, and so long as he does he shall take all of the earnings. said employment as general manager shall be without

other salary to said Cochrane, and shall last so long as each condition of this contract is complied with up to the time when said property is conveyed to the New Company, not exceeding, however, six (6) months from this date in any event. As a condition precedent to this contract being in force, to secure the portion of this agreement requiring the standardizing of the present Tombigbee & Northern Railway Company and the payment of operating expenses incurred after this date and before the transfer to said New Company, said Cochrane shall forthwith deposit with the Fidelity Trust Company, of Kansas City, Mo., the sum of five thousand dollars ($5,000.00), to be applied upon any such unpaid operating expenses, provided that each month when he has paid all the operating expenses incurred for that month he shall be entitled to draw down one-sixth of the amount, and should the standardizing be completed before the end of the six (6) months he shall be entitled to draw the entire amount thus deposited. As another condition precedent, he shall forthwith deposit with the Fidelity Trust Company, of Kansas City, Mo., all the stock of the Carrollton Short Line Railroad Company, indorsed in blank, as security for the agreement to have the road standardized on or before the 1st day of April, 1904, and when said standardizing is completed and paid for said stock of the Carrollton Short Line Railroad Company hereinabove required to be deposited shall remain in said John T. Cochrane and his associates, so long as each condition secured by such stock required herein of him and the New Company is performed within the time fixed, and in like manner said Cochrane and his associates shall have the voting power upon the stock in said company so long as each condition hereof is performed in the time fixed, In case of any default

in said conditions, the voting power shall be in the person whose name is inserted by the Fidelity Trust Company, of Kansas City, Mo., as indorsee.

"In witness whereof, the parties have hereunto signed our names and attached our seals in triplicate the day and date first above written. [Properly signed and sealed.]

"SCHEDULE A.

"(1) For hauling logs to mill and lumber to shipping points at the rate of $1.50 per M feet on the basis of the cut of the mill. This charge shall include setting empty cars where and when required, and moving loads likewise, or when convenient to the railroad company, if not interfering with operations of the lumber company. For hauling the lumber in yard, or made from logs in yard, on or before October 1, 1903, the rate shall be $1.50 per M feet of the lumber hauled. (2) Freight rates on crude turpentine, naval stores, and other stuff shall be as follows:

| | |
|---|---|
| Merchandise from Bluffs to Fairford at | $12.00 per car. |
| Merchandise from Calvert to Fairford at | 10.00 per car. |
| Merchandise L. C. L. Bluffs to Fairford at | 5 cents per Cwt. |
| Merchandise L. C. L. from Calvert to Fairford at | 5 cents per Cwt. |
| Naval Stores from store No. 2 to Fairford at | $14.00 per car. |
| Naval Stores from store No. 2 to Calvert | 16.00 per car. |
| Naval Stores from Fairford to Calvert | 10.00 per car. |
| Naval Stores from store No. 2 to Bluffs | 18.00 per car. |
| Naval Stores from Fairford to Bluffs | 12.00 per car. |
| Crude staves, empty barrels, etc., from any point on the line to Fairford at | 10.00 per car. |

[Tombigbee Valley R. R. Co. v. Fairford Lumber Co.]

"By car is meant when transported in standard-gauge cars. If cars of narrow-guage capacity are used in hauling merchandise, naval stores, and crude turpentine and other commodities (except logs and lumber), the charge shall be at the freight rates in force prior to date October 1, 1903. (3) For switching from mill to plainer and kiln, $2.00 per car. (4) Any sums received by the railroad company by virtue of arrangements with connecting carriers shall not be applied upon or used to reduce the above charges.

## "EXHIBIT B.

"This agreement, made and entered into this 13th day of April, 1904, by and between the Tombigbee Valley Railroad Company, first party, and the Tombigbee Lumber Company, second party, witnesseth: Whereas, upon October 1, 1903, a contract was executed in the form shown by copy hereto attached, marked 'Exhibit A,' and made a part hereof; and whereas, the New Company mentioned in said contract has been organized under the name of the Tombigbee Valley Company; and whereas, certain duties and obligations were contemplated by the said contract to rest upon the Tombigbee Lumber Company and the New Company so to be formed; and whereas, said contract has been to a greater or less degree carried out by the parties, but no formal contract has been signed by the Tombigbee Lumber Company and the New Company to do and perform the things mentioned in paragraph 2 of said contract and Exhibit A thereto: Now, therefore, in consideration of the premises, each of the parties hereto agrees to do and perform all of the acts contemplated to be performed by it under and pursuant to said paragraph 2 of said contract and Exhibit A thereto.

"In witness whereof, the parties, by their respective officers, have signed this instrument and caused the seals of their respective corporations to be attached on the day and year first above written."

The bill alleges that originally the timber lands and sawmill property which is now owned by complainant and the railroad property now owned by respondent were one and the same, and that when it was determined to sell and divide the same this contract was made; that following the making of the contract the Tombigbee Lumber Company, then in full enjoyment of all the contract rights with the railroad company above set out, sold and conveyed all its property of every kind and description, and particularly the traffic contract with the railroad company to A. S. Terrill, and that Terrill purchased it expressly subject to the said traffic contract, and agreed on his part to abide all its terms and stipulations; that shortly after Terrill purchased he associated others with himself, and on the 17th day of April, 1905, they organized the complainant corporation, and he conveyed the property in its entirety, and all his rights in connection therewith and incident thereto, including the right to have and enjoy the said freight or traffic contract, to the said Fairford Lumber Company, complainant in this case. The bill further shows that the life and existence of complainant company and its business is dependent upon the movement of logs to the manufacturing plant and the movement of the finished product from the plant to points where it can reach the outside world; that the company is violating its traffic contract and fixing arbitrary charges, such as will destroy the very business existence of the complainant. It is further alleged that the company cannot be made to respond in damages, owing to its insolvency. The prayer of the bill is for a decree re-

quiring and commanding defendant in all things to abide by and specifically perform the contract until its expiration, and forever enjoining and prohibiting the defendant from charging the complainant any freight rates or charges for logs shipped or hauled to the mill of complainant or for lumber shipped or hauled from the mill of complainant to the shipping point other than those fixed, agreed upon, and made by said contract, and for a statement of account between the parties, to ascertain the amount of freight and overcharges exacted from complainant over and above the contract price.

Motion was made to discuss the bill for want of equity, and demurrers were interposed raising the question that the contract is not one that a court of equity will specifically enforce, and because in and by the contract sought to be enforced a special rate it attempted to be given to a corporation and its successors and assigns, which is not given to aid in the developmeent of any industrial enterprise in the state, and because it appears from the allegations of the bill that in and by the contract sought to be enforced a special rate is given to a corporation, and it is not shown that such special rate is given to aid in the development of any industrial enterprise and published as required by law. Other demurrers were interposed as to accounting features of the bill not necessary to be here set out. Motion and demurrers were overruled.

GREGORY L. & H. T. SMITH, and R. W. STOUTZ, for appellant. Contracts based on personal confidence cannot be assigned.—*Burck v. Taylor*, 152 U. S. 634; *Kansas Valley S. Co. v. Belden M. Co.* 127 U. S. 379; 2 A. & E. Ency of Law, 1035. The contract is such as will not permit of specific performance. It is manifest that the conditions cannot be specifically enforced against

appellee, and the court will not enforce performance against a party to whom the court could not afferd similar relief.—*Pullman Palace Car Co. v. Texas & P. R. R. Co.* 11 Fed. 629. There must be mutuality of remedy. —*Electric L. Co. v. M. & S. H. Ry. Co.* 109 Ala. 193; *Iron Age Pub. Co. v. W. U. Tel. Co.* 83 Ala. 510; *Chadwick v. Chadwick,* 121 Ala. 580. A court of equity will never decree the specific performance of a contract involving the exercise of personal skill, judgment or dis cretion.—26 A. & E. Ency of Law, 102 *Electric L. Co. v. M. & S. H. Ry. Co.* supra; *Harrick v. Hanman,* 168 U. S. 336; *Marble Co. v. Ripley,* 10 Wall. 358; *T. & P. R. R. Co. v. Marshall,* 138 U. S. 406; *Buck v. Smith,* 29 Mich. 166; *Blanchard v. Detroit R. R. Co.* 31 Mich. 43. Equity will refuse specific performance of any contract which imposes continuous duties extending over a long period of time.—*Wingo v. Hardy,* 94 Ala. 190; *S. & N. A. R. R. Co. v. H. A. & B. Ry. Co.* 98 Ala. 400; 32 Ga. 550; 37 Fed. 733 and authorities supra. The contract grants a special rate for transportation over a railroad to one member of the publice not granted to others. This is in violation of public policy of the state.—*Southern Ry. Co. v. Harrison,* 119 Ala. 579; 39 N. J. L. 407; 118 Ill. 250; 3 N. E. 907; 7 Atl. 809.

FITTS, LEIGH & LEIGH, for appellee. The contract does not violate public policy.—*M. & O. R. R. Co. v. Dismukes,* 94 Ala. 131; *Cowden v. Pac. Steamship co.* 28 Am. St. Rep. 142; *Lough v. Outterbridge,* 42 Am. St. Rep. 712; *Johnson v. P. & T. R. R. Co.* 26 Am. Rep. 731; 5 Cyc. 707; Hutchinson on Carriers, sec. 804. The contract is not merely a shipping contract but one that contains many other agreements and stipulations, and is not wanting in mutuality.—*Evans v. C. S. & M. Co.* 78 Ala. 341; *Baxley v. Tallassee F. M. Co.* 128 Ala. 183; *Davis v. Williams,* 121 Ala. 542.

[Tombigbee Valley R. R. Co. v. Fairford Lumber Co.]

ANDERSON, J.—This court, in a very full discussion of the doctrine of specific performance of contracts, speaking through Brickell, C. J., in the case of *Irwin v. Bailey*, 72 Ala. 467, says: "The principles upon which a court of equity exercises its peculiar jurisdiction to enforce the specific performance of contract are well known, and have been of frequent consideration and application in the past decisions of this court. The court will not intervene, unless the contract is fair, just, reasonable, and equal in all its terms and parts, is is founded upon an adequate consideration, and its specific execution is free from hardship and oppressoin. If, on either of these points, there be a well-founded objection, the court abstains from interference, leaving the party complaining of a violation of the contract to the remedies afforded him in courts of law. In the exercise of the jurisdiction, the court is invested with a discretion—not arbitrary or capricious, but a sound, judicial discretion, molding and tempering its action, or the refusal to act, in view of the circumstances of the particular case, and from them determining whether the conscience of the party charged with a violation of the contract is so affected that moral and equitable duty compel him to a strict performance, rather than to a payment of such damages as a court of law would award against him. A primary duty of the court is to examine the contract, not merely as a court of law would examine it, to ascertain what the parties have in terms expressed, but what in truth was the real intention of the parties, and to carry that intention into effect, or leave the parties to their legal remedies.—*Hipwell v. Knight*, 1 Y. & C. Exch. 411. There is no class of cases, to which the jurisdiction of a court of equity extends, that the maxim 'he who seeks equity must do equity' is more rigidly applied. Hence it results that the contract or agreement

which the court is asked to enforce specifically must not only be certain, fair, just, reasonable, and equal in all its parts and terms, must not be merely voluntary, but founded upon a valuable and adequate consideration, and it must be mutual in its operation and effect. As is said by Prof. Pomeroy: 'The contract must be of such nature that both a right arises from its terms in favor of either party against the other, while the corresponding obligation rests upon each towards the other, and also that either party is entitled to the equitable remedy of a specific execution of such obligation against the other contracting party.'—Pomeroy on Contracts, § 162. Or as is said in another work: 'A contract, to be specifically enforced by the court, must be mutual; that is to say, such that it might, at the time it was entered into, have been enforced by either of the parties against the other of them. Whenever, therefore, whether from personal incapacity, the nature of the contract, or any other cause, the contract is incapable of being enforced against one party, that party is equally incapable of enforcing it against the other, though its execution in the latter way might in itself be free from the difficulty attending the execution in the former.'—Fry on Specific Performance, § 286. 'I have no conception,' said Lord Redesdale, in *Lawrence v. Butler,* 1 Sch. & Lef. 13, 'that a court of equity will decree a specific performance, except when both parties have a right by the agreement to compel a specific performance, according to the advantage which might be supposed to have been derived from it.' Were it otherwise, a specific performance might be decreed when, if it was disadvantageous to the party complaining, he could not, at the instance of the other party, be compelled to perform. There are some cases in which a want of mutuality in the contract at the time it was entered into is not regarded as an insupera-

[Tombigbee Valley R. R. Co. v. Fairford Lumber Co.]

ble obstacle to specific performance.    These rest upon
their own peculiar circumstances and facts.    Perform-
ance by the one party, and its acceptance by the other,
may entitle the party performing to the assistance of the
court, though he could not have been compelled to per-
form.    The contract of an infant is voidable; but, after
arriving at age, he may affirm and enforce it, notwith-
standing the original want of mutuality.    The class of
cases to which we refer are exceptions to the general
principle, and involve considerations which justify the
court in the specific performance of the contract.    But,
when the contract, in its nature and character and ac-
cording to the intention of the parties, involves and im-
poses a reciprocity of obligation and duty, there is no
authority for enforcing specific performance of it in
favor of a party who on his part has not performed, can-
not be compelled to perform, and is not capable of per-
forming.—*Cooper v. Pena,* 21 Cal. 404." The foregoing
doctrine was reaffirmed in the case of *Electric Co. v.
Mobile,* 109 Ala. 195, 19 South. 721, 55 Am. St. Rep. 927.

Applying the rule to the case at bar, the question aris-
es, could a court of equity have required a specific per-
formance on the part of Flower & Hagerman of the con-
tract as entered into with Cochrane, the predecessor of
this respondent?    We think not.    The contract required
of them the continuous operation of the mill, so long as
they owned it (not exceeding, of course, the period of
the contract), the granting of such a right of way as was
required by the new company for the extension of its
main line, the furnishing of roadbed and right of way
and the laying of the ties ready for rails upon spurs to
be built to and through lands whereon timber has been
cut.    "Contracts which by their terms stipulate for a
succession of acts, whose performance cannot be con-
summated by one transaction, but will be continuous,

and require protracted supervision and direction, with the exercise of special knowledge, skill, or judgment in such oversight, * * * are not, as a rule, specifically enforced."—Pomeroy on Specific Performance of Contracts, § 312, and cases cited in note 5; Waterman on Specific Performance of Contracts, § 49; *Electric Co. v. Mobile, supra.* So, too, must the contract be such a one as can be enforced in its entirety. A partial enforcement by piecemeal will not suffice. A court of equity would find it quite difficult to require and supervise the operating of a big sawmill for a considerable period, together with the other things covenanted to be done by the complainant's predecessors, Flower & Hagermon. It is true, under the terms of the contract, the successors are not compelled to operate the mill, and that it was only to be operated while owned by Flower & Hagerman, so long as they owned it; but we must deal with the contract upon the status existing at the time of its execution, and not according to subsequent conditions. As said above, there are some cases in which a want of mutuality in the contract at the time it was entered into is not regarded as an insuperable obstacle to specific performance; but this case is not within the exception, as it requires and involves and imposes a reciprocity of obligation and duty. Therefore, dealing with the contract as entered into between the parties, it was incapable of being specifically enforced in a court of equity as against Flower & Hagerman, and it would be inequitable to permit their successors to require specific performance of the respondent, even if their undertaking is susceptible of specific performance in a court of chancery, which we need not decide.

Moreover, while the original contract did not require the operation of the mill by the successors of Flower & Hagerman, yet this complainant was required, under

the terms of the conveyance through which it claims any rights in the premises, to perform all the terms of paragraph 2 of the original contract, except as to the cancellation of certain bonds, and which included the operation of the mill and doing of other things hertofore enumerated. The cases of *Evans v. Cincinnati R. R. Co.*, 78 Ala. 341; *Baxley v. Tallassee Co.*, 128 Ala. 183, 29 South. 451, and *Davis v. Williams*, 121 Ala. 542, 25 South. 704, cited by counsel for complainant, refer to actions at law for damages for the breach of contracts. Of course, there are many contracts not specifically enforceable in equity which will afford an action at law for the breach of same. Nor do we consider the case of *South & North R. R. Co. v. Highland Co.*, 98 Ala. 400, 13 South. 682, 39 Am. St. Rep. 74, which is an equity case, opposed to the opinion in the case at bar. The chancellor erred in not sustaining the motion to dismiss the bill for want of equity, and the decree of the chancrey court is reversed, and one is here rendered dismissing the bill.

Reversed and rendered.

TYSON, C. J., and DOWDELL and McCLELLAN, JJ., concur.