118 So.2d 744

Mary Katherine Rhodes JOHNSTON et al.

v.

Mildred Kahn ROTHENBERG et al.

I Div. 854.

Supreme Court of Alabama.

March 10, 1960.

Caffey, Gallalee & Caffey, Mobile, for appellants.

Vincent F. Kilborn, Mobile, for appellees.

MERRILL, Justice.

Appeal from a final decree in equity denying the relief of specific performance of an alleged contract to convey lands which was sought by complainants.

At one time, the 633-acre tract of land in question, which is located in the Cottage Hill area in Mobile, but then was farm land outside the city limits of Mobile, was owned by W. M. Weatherby of Mobile, John A. Carroll of Birmingham and Leo Kahn and H. M. Rhodes of Memphis, Tennessee. Each owned a one-fourth interest and did not sell during his lifetime.

Kahn died in 1934 and willed his interest to his widow, Mildred Kahn, the appellee, who is now Mildred Kahn Rothenberg. The will was probated in Tennessee, and was sufficient to pass title in Alabama. On advice of counsel, the will was not probated in Alabama for lack of need un-der our statute, Tit. 61, § 46, Code 1940, prior to amendment in 1951.

Another owner, Rhodes, died in 1941. His property passed to his widow and upon her death to their three adult daughters, the appellants, who are sometimes referred to in correspondence as "the girls." The business affairs of the Rhodes family were handled by their accountant, S. G. Carkeet, who had full authority to act for them.

Carroll died and his interest passed to his widow, and at Weatherby's death, his interest passed to his heirs, some eighteen in number, but the Weatherby interest is of little concern in the instant case.

Appellee, Mrs. Rothenberg, who lived in California, was not as wealthy as appellants and had been wanting to sell her interest in the lands. She came to Mobile in 1950 to try to sell the lands and while there met Mr. Jere Austill, Sr. of the Mobile Bar, and he was subsequently employed by appellee as her attorney, and there is no question but that his actions as her attorney were authorized or ratified by her.

Appellee wanted $10,000 for her one-fourth interest in the lands. There was correspondence between appellee, Carkeet and Austill until there was an apparent meeting of their minds at an agreed price of $7,525, provided appellee could convey good title approved by Title Insurance Company of Mobile. The contract on which appellants base their suit, and which appellee denies, grew out of correspondence between the three between April 25 and May 2, 1953.

In preparing the abstract of title, it was discovered that the statute, Tit. 61, § 46, Code 1940, had been amended in 1951 to provide that "no such will (a foreign will) shall be probated within this state unless presented for probate within five years from the date of the death of the testator." That, for the first time, put the same time limitation on the presentation of a foreign will for probate as required for a domestic will. Tit. 61, § 34, as amended. Since

Kahn's will had never been probated in Alabama, and his death had occurred in 1934, the position was taken by the Title Company, Austill and the probate judge that the statute prohibited the probation of the will and there was, therefore, no record of the passage of title from Kahn to his wife.

Much more correspondence passed between the three, and Austill sought to secure a quitclaim deed from Kahn's brother, Henry, and Mrs. Scott, a sister, to appellee. When it appeared that this could be accomplished, Henry Kahn died and it then became impossible to secure a deed from all of Henry Kahn's heirs and legatees; and Mrs. Scott, who had signed an incorrect deed, would not agree to sign one carrying the correct description of the property. Correspondence continued until December, 1953, when two letters were written which appellee contends show the contract, if there was one, was abandoned. There was no further correspondence between Austill and Carkeet until March, 1956.

In February, 1956, appellants learned that appellee had made a contract with one Morrill, who lived in Mobile, to sell her interest in the lands to him for $10,000 and Morrill's agreement to "exercise his best efforts to secure the passage of" a bill in the Legislature (then in session) permitting the "legal probate" of the will of Leo Kahn, and he was to have two additional "regular terms" in which to get the bill passed. As a result of this information, appellants retained counsel and the bill for specific performance was filed on June 8, 1956, praying that appellee be required to convey such title as she had before her contract with Morrill, and that her contract with him be cancelled. Morrill was made a party to the bill. When the evidence was closed, it was announced to the court that Morrill was no longer defending against the suit since he and appellee had made a side agreement to share equally in appellee's interest in the event she was successful in this suit.

After demurrers were overruled and answers filed, the cause was heard on October 1–4, 1958. The case was tried on the issue of whether there was a contract, abandonment of the contract, estoppel by inaction to insist upon a conveyance by respondent of whatever title she had, and permitting a "great period of time" to elapse without insisting on performance by respondent to the extent she was able to convey a title. Appellee also presented evidence of the great increase in the price of the land.

The contract price in 1953 was approximately $50 per acre. One of the appellants testified that they had refused $1,200 per acre in 1957, and a Mobile realtor placed the value at $1,500–$1,600 per acre at the time of trial, October, 1958. This last value was not disputed in the evidence.

The trial court denied the relief sought by the bill. After citing Carlisle v. Carlisle, 77 Ala. 339, the court stated:

"Taking all of the testimony and exhibits as offered on the hearing hereof into consideration, and conceding without deciding that there was made a binding contract of purchase and sale between the Complainants and the Respondent Rothenberg, the Court is not satisfied that the Complainants have met that degree of proof in this case which would entitle them to relief in a Court of Equity by way of specific performance of a contract to convey lands in the exercise of a judicial discretion.

"It is therefore, considered, ordered, adjudged and decreed by the Court that the relief prayed in the bill of complaint be and the same is hereby denied and said bill is hereby dismissed."

The principles stated in Carlisle v. Carlisle, 77 Ala. 339, are:

"The equitable remedy of specific performance of agreements for the sale of lands rests largely in judicial discretion, directed and regulated by

defined rules. Well settled elements and incidents are requisite to granting relief; but whether relief shall be granted depends upon an equitable consideration of the particular circumstances of each case. The contract must be just, fair, and reasonable; must not have originated in mistake, or surprise, or violation of confidence, or breach of trust, or advantage of condition, nor been obtained by any unconscientious or unfair methods; must be reasonably certain in respect to the subject-matter, the terms, and stipulations; must be founded on a valuable consideration, and its performance not work hardship or injustice."

Similar statements of principles governing specific performance appear in Tombigbee Valley R. Co. v. Fairford Lumber Co., 155 Ala. 575, 47 So. 88.

■ Much argument is made in brief as to whether there was a contract. We have read the pertinent correspondence in consultation and we are convinced that there was a meeting of the minds that appellee would be paid $7,525 cash for her one-fourth interest, that she would furnish a title acceptable to Title Insurance Company of Mobile and would pay for correcting any defects in title at her own "expense, forthwith, otherwise, this contract to be null and void as to purchasers." While all the terms were never collected in one written contract as was suggested in the correspondence, we think the parties agreed on and ratified the terms, and it was contemplated by all of them that a proper deed and the money would be exchanged in a very short time.

■■ That brings us to the question of the abandonment of the contract. Appellants insist that we should apply the rule that where the vendor is unable to complete or perfect title, specific performance pro tanto at the election of the vendee has been a recognized remedy in equity from our earliest judicial history. Saliba v. Brackin, 260 Ala. 103, 69 So.2d 267; Pearce v. Third Ave. Improvement Co., 221 Ala. 209, 128 So. 396. Appellants would also have us apply the rule that where the contract calls for performance within a reasonable time, neither party to the contract can rescind, repudiate or abandon it for delay in performance, without first giving the opposite party notice and opportunity for a specified and reasonable period of time to comply with the contract on his part. Wilson v. Thompson, 255 Ala. 165, 51 So.2d 20; Sims v. City of Birmingham, 254 Ala. 598, 49 So.2d 302. We recognize the validity of these rules but we do not consider them to be applicable to the facts in the instant case.

In Clark & Co. v. Nelson, 216 Ala. 199, 112 So. 819, 53 A.L.R. 173, we quoted with approval the following from 3 Williston on Contracts, § 1826:

"The agreement to rescind or modify need not be express. Mutual assent to abandon a contract, like mutual assent to form one, may be inferred from the attendant circumstances and conduct of the parties (citing Clark & Co. v. Nelson, 216 Ala. 199, 112 So. 819 [53 A.L.R. 173]). Therefore, 'If either party without right claims to rescind the contract, the other party need not object, and if he permit it to be rescinded, it will be done by mutual consent.' (citing Moline Jewelry Co. v. Crew, 171 Ala. 415, 55 So. 144)."

Still further in the same section, we find: "Sometimes circumstances of a negative character, such as failure to take any steps looking towards the enforcement or performance of the contract, also justify the inference of mutual assent to rescind," citing Dowling-Martin Grocery Co. v. J. C. Lysle Milling Co., 203 Ala. 491, 83 So. 486.

We think the following two letters, together with other circumstances, show that there was a mutual abandonment of the contract. The reference to "the Memphis people" in both letters is to the people who would inherit Kahn's interest if his

will were ineffectual in conveying his interest to his wife, the appellee.

"Memphis, Tenn.
"December 7, 1953
"Mr. Jere Austill
"1004 Van Antwerp Building
"Mobile, Alabama

"Re: Contract to Sell Cottage Hill Property–Mrs. Mildred Kahn Rothenberg

"Dear Mr. Austill:

"I do not find in my file any information from you later than your letter of August 4, with reference to the above matter. In that letter, you state you will keep me advised of any definite developments.

"Since I have heard nothing further from you, I take it that there have been no definite developments. I would like to ask if anything at all is being done in an effort to enable us to conclude the deal.

"In the seventh paragraph of the above referred to letter, you advised us that it would be inadvisable for us to attempt to trade with any of the Memphis people, and I wonder if the situation has changed, and if Mrs. Rothenberg has abandoned the matter entirely? If so, we would feel free to negotiate with the others, primarily because we just think the thing is getting too complicated, and we are getting too many interests involved in this piece of ground.

"I do not know why, but Title Insurance Company rendered a charge against us for $30.00 for preliminary title work they did on the Rothenberg-Leo Kahn interest. I suppose this charge was made because you and we talked with them concerning this matter, and they did certain work. It seems to me that this charge should be borne by Mrs. Rothenberg, since everything that has been done by either of us has been in the direction of helping her clear up the title. We have paid the bill.

"I should appreciate a word from you.

"Yours very truly,
"S. G. Carkeet
S. G. Carkeet"

"December 8, 1953
"Mr. S. G. Carkeet
"64–68 N. Main Street
"Memphis, Tennessee
"Dear Sir:

"Your letter of the 7th instant just received.

"There have been some very definite developments in the matter of Rothenberg title, but unfortunately of such a nature as prevents her from being able to sell the land to you.

"For some reason after we wrote we had all the Memphis people straightened out we had a letter from Mr. Boone advising us that they would not release any legal claim they had to the property to Mrs. Rothenberg, but on the contrary would contend for any interest that the law gave them. Just what brought this about is a mystery to me, but the matter has stood still since then.

"I am afraid that some stranger to your trade put an oar in the water to prevent your purchase of the property. I am not a normally suspicious man but the letters I had had from Mr. Boone were so friendly and his action had been so helpful prior to that time, that I cannot help but think something of this nature occurred.

"As it stands Mrs. Rothenberg would be happy to sell you her interest in the property in fulfillment of her agreement, but your title would not be good and would not be guaranteed by the Title Insurance Company of this city.

"In the circumstances it might not be amiss for you to cautiously feel around and find out what you can.

"We had expected a deed from Mrs. Scott and were negotiating for a deed from the Bank as executor and trustee

of the estate of Mr. Henry Kahn for a nominal consideration, which would have cleared up the title of Mrs. Rothenberg. Having failed to get these releases leaves us in bad shape.

"You are in contact with all of these people in Memphis and if you feel able and willing to undertake to straighten out the trouble I am sure the lady in California would be undyingly grateful to you.

"If you have any information it will be a pleasure to hear from you.

> "Yours very truly,
> "Austill & Austill"

We think a fair appraisal of these letters is that Carkeet, for his principals, wanted to know if appellee had abandoned hope of clearing the title and, if so, he would be free to contact the other claimants in Memphis. Then Austill, for his principal, holds out no hope, states that they would be glad to convey, but the title would not be good and could not be guaranteed, which requirement, under the contract, if not met rendered the contract "null and void as to purchasers."

Some of the other circumstances showing an abandonment are listed:

1. Whereas, correspondence between the two agents had been regular from April to December, 1953, no further letters were written from one to the other until March, 1956, after appellants learned that appellee had contracted with Morrill.

2. On May 21, 1953, Carkeet wrote Title Insurance Company of Mobile supplying information about the Kahn heirs and sent a copy of the letter to Austill. He expressed the hope that the papers and information he sent might help to get a Title Policy issued "because our deal hinges on just that."

3. While the negotiations were going on between appellants and appellee, Carkeet purchased for appellants the Carroll one-fourth interest in the property for $10,000. He sent the Carroll deed to Title Insurance Company in order to get a title policy, but he directed them by telephone and by letter not to record the Carroll deed until the negotiations between him and appellee were terminated. He repeated "please do not record until we tell you that negotiations for the other piece have been concluded." The letter was dated May 22, 1953, during the time that appellee was trying to perfect title. On August 15, Carkeet wrote Title Insurance Company "Indications now are that we are not going to be able to conclude the Rothenberg deal for sometime, if ever. We still think it inadvisable to record the Warranty Deed covering the sale of the Carroll interest, therefore, we do not wish this done." But on October 7, 1953, after the Legislature had adjourned sine die on September 11, without changing the law, Carkeet wrote Title Insurance Company:

"Also, Mr. Goodloe, we have been withholding the recording of the Warranty Deed from Mrs. Carroll to my principals, and it now seems that negotiations have stopped with reference to the acquirement by us of the Rothenberg one-fourth undivided interest, so if you will be kind enough to do so, please have this Warranty Deed recorded, sending us a bill for all the money we owe you."

This strongly indicates that Carkeet felt that nothing else could be done.

4. On June 26, 1953, while Austill was still trying to clear the title, Morrill offered appellee $12,500 for her interest and she wrote Austill about it and said "Please get me out of Mr. Carkeet's deal if possible." Austill answered, in part, as follows:

"We cannot call off your agreement to sell to Mr. Carkeet no matter what Mr. Morrell has offered you.

"You made a written agreement, he accepted it, and it is your duty to perform, even though it is distasteful to you.

"We have been endeavoring to get the title cleared so that the Title Insurance Company would approve it for

Mr. Carkeet. His proposition was predicated on a guaranty of title from the local company.

"As yet we have not been able to remove the legal defects in your title in spite of our efforts. I have every hope of ultimately being able to get it done, but you have no idea of the trouble we are going through.

"If Mr. Carkeet becomes discouraged and elects to release you, then you would be free to sell to Mr. Morrell. Until that happens your hands are tied and you cannot accept any offer from Mr. Morrell."

But in August, 1955, Austill drew up a contract between Mrs. Rothenberg and Morrill for the sale of her interest to Morrill if he could get the Legislature to amend the law so as to allow her husband's will to be probated. It is not likely that a lawyer of Austill's ability and standing would have changed his position regarding the ability of his client to deal with Morrill if he had not considered the contract as having been abandoned by both parties.

5. When testifying in the case, Austill stated "I thought conscientiously that the Carkeet deal was completely abandoned by virtue of the fact that he imposed conditions in his offer which we could not meet." Again, "I considered the Carkeet deal out of the way because I didn't consider it possible of fulfillment." Also, "I considered at the time (1955, when he drew the Rothenberg-Morrill contract) the Carkeet deal was a dead duck. I didn't think it was possible to consummate it on the conditions that Mr. Carkeet laid down."

6. Later in February, 1956, some of the Weatherby heirs consulted Austill about securing a sale of the land for division since they held a one-fourth interest. Austill wrote Carkeet that this would probably be done unless they wanted to make Weatherby an offer for the appellants' half interest (their original one-fourth and the Carroll one-fourth). Carkeet answered the letter on February 20, 1956, suggesting a partition in kind, but making no claim of any contract with appellee.

Just as we think from the correspondence and the oral testimony that there was a meeting of the minds as to the terms of the contract for sale, so also we think from the correspondence, the testimony and the circumstances that there was a mutual abandonment of the contract because it appeared that appellee could not convey the clear title demanded by Carkeet for appellants.

It follows that the decree of the trial court denying specific performance should be affirmed.

Although it has no influence upon this particular case, we note that Tit. 61, § 34, Code 1940, as amended, was again amended by Act 587, General Acts of Alabama 1959, to meet the impediment to the probating of the will of Leo Kahn, deceased.

Affirmed.

LAWSON, SIMPSON, GOODWYN and COLEMAN, JJ., concur.