302 So.2d 97

**David E. WEBSTER and wife, Martha J. Webster**

v.

**James O. GUNTER and wife, Mary G. Gunter et al.**

SC 585.

Supreme Court of Alabama.

Oct. 3, 1974.

Rehearing Denied Nov. 7, 1974.

Phillips & Funderburk, Phenix City, for appellants.

Cornett & Perdue, Phenix City, for appellees.

COLEMAN, Justice.

Plaintiffs appeal from judgment denying specific performance of contract to sell land.

Plaintiffs are David E. Webster and his wife, Martha J. Webster.

A number of original defendants were stricken and as last amended, the complaint is against James O. Gunter, his wife, and his mother.

Plaintiffs seek to enforce a contract by defendants to sell to plaintiffs the following described land:

"  .   .   .   Approximately 70 acres from Lot #5, in South West Quarter of 25, being in township 17 and range 27 of Russell County, Alabama."

The purchase price is $21,000.00. Earnest money was $500.00.

Lot #5 contains 97 acres and appears to lie on the East side of a county road. Defendants own an interest in additional land adjacent to Lot #5 as I understand the record.

On January 6, 1973, the contract was signed by the parties and Glenn D. Waldrep, Broker, Agents of Waldrep Realty Company.

Plaintiff, Martha J. Webster, was a "salesperson" operating under Mr. Dawson. Waldrep gave a listing on the land here involved to Martha J. Webster. She gave a check for $500.00 to Waldrep.

The contract was signed at the Gunter home. James O. Gunter testified that after the signing the parties visited the property. He testified further:

"A. No, sir. In fact, I never did get a copy of that contract; only one was made. And I asked Mr. Waldrep on several occasions to present me a copy. I never did receive one until about the time of this litigation.

"  .   .   .

"Q. How many did you sign, one or two?

"A. One copy.

"Q. · One copy was made. And did I understand you to say that you were to later get together and sign a typewritten copy?

"A. Yes, sir. At the time Mr. Waldrep was supposed to have made up another contract, which it was specified typewritten, that we were to have four copies, and that was to be executed by—I didn't tell them who the uncle and aunt was but that I was to have them down, all of us get together, and if we could reach a definite decision each person would be given a copy.

"Q. Were you further to reach a decision as to the land and the land description?

"A. Yes, sir. I did not have a survey at that time of the 70 acres. It states there approximately 70 acres that we estimated it. We had an aerial photograph but you cannot tell exactly where the 70 acres would be.

"Q. Then you were to have a survey made and were to have a definite description set up?

"A. Yes, sir.

"Q. To be put into a binding contract?

"A. Right.

"Q. A later contract?

"A. Right.
"  .   .   .

"Q. You didn't have the advantage of a survey at that time, did you?

"A. No, sir, no survey was made.

"Q. Did you have with you the aerial photograph?

"A. I believe Mr. Waldrep had that aerial photograph. I did leave that in his

possession when he was out there before and I think he still had it.

"Q. While you were on the ground did y'all reach any agreement as to points of boundaries that would encompass the approximately 70 acres of land subject to the contract?

"A. We talked of several possibilities.

"Q. Now, were these on the east boundary pretty well set? ·

"A. Well, the east boundary was set, yes, sir, because it's a fence going down the east boundary.

"Q. That's your east property line, is it not?

"A. Yes, sir.

"Q. Was the south property line set?

"A. No. You have a difference in sections down in there and it never was set definitely, although we just went by the photograph. We did not go to any of these lines.

"Q. Did y'all reach any agreement there in the presence of one another by pointing out from point to point what the lines south of the lake would be running generally northeast and southwest?

"A. Let's see, say that one more time.

"Q. This would be the line that would be immediately south of the lake. Do you recognize the lake on this exhibit?

"A. Yes, sir. That's the lake right here (indicating).

"Q. Did you reach any agreement with them for a line anywhere in this area as to where it would be?

"A. No, sir, nothing definite. We were just wondering where, you know, how close we could get, or how far it had to be getting something approximately 70 acres. And we did not reach a line on how far this would go, either. It would vary on that part. This part would be definite because the fence line is down there.

"Q. As a matter of fact, you couldn't tell where your line up here would have been, the line that would have been to the northwest side?

"A. No, sir.

"Q. Due to the quantity of land you couldn't tell?

"A. That's correct.

"Q. Did you cause a survey to be made of this property subsequent to January the 6th?

"A. Yes, sir, I had a survey made. In fact, he made another one soon after then."

The contract calls for land in Section 25. The map made by the surveyor includes land in Section 36. Subsequently the surveyor made another map showing 3.4 acres to be taken out of the northwest corner.

The trial judge held that the description in the contract was uncertain. The following excerpts are from the decree:

"Now come the parties and submit for final decree on the complaint, as amended, answer thereto, and testimony taken orally before the Court. .   .   .

"  .   .   .

"At the time the sales contract was executed there was an outstanding mortgage in the amount of approximately $7,480.00 to the Federal Land Bank, secured by the entire tract of 199 acres. Too, the defendants had some seven months earlier (June 5, 1972) conveyed to one Olive S. Gunter an undivided one-half (½) interest in and to the entire tract of 199 acres. Olive S. Gunter did not execute the sales contract;

is not a party to this suit; and in fact declines to execute any conveyance of her interest to the 199 acres or any part thereof. Under these conditions on January 6, 1973, the defendants jointly owned only an undivided one-half interest to the entire tract of 199 acres, out of which the 70 acres was to be carved, and also were mortgagors as to the entire tract of 199 acres.

"The contract provided that the sale would be closed within sixty days from the date of execution, 'OR AS SOON AS MERCHANTABLE TITLE CAN BE EFFECTED, and conveyance is to be made by warranty deed, free from all incumbrances . . .' (emphasis supplied).

"During the sixty days succeeding the execution of the sales contract, the defendants were informed by Olive S. Gunter that she would not join in the execution of the sales contract nor would she join in any conveyance. They further learned that the Federal Land Bank would not execute a release to the 70 acres on a partial payment of the balance due under the mortgage, but insisted that the full amount due be paid. No merchantable title could be conveyed prior to the expiration of the 60 days, and could not in fact be conveyed as of the date of trial.

" . . .

"During the sixty days another dispute arose between the parties as to the location on the ground of the 70 acres to be carved from the entire tract of 199 acres. No survey had been prepared prior to executing the sales contract and the parties had generally walked over the tract without establishing any boundary lines or noting any identifying objects as located on or near any of the boundary lines. On January 30, 1973 a plat was prepared showing 70 acres, more or less, of defendants' property, but a part of the 70 acres did not lie in the Section 25 named in the sales contract, but in the adjoining Section 36 instead. The plat further reflected that defendants owned an ample amount of acreage in Section 25, and apparently within the Lot #5 to comply with the acreage requirements. The parties are in complete disagreement as to the point on the west boundary of the platted 70 acres, more or less, where the boundary line will turn in a northeasterly direction to either include or avoid a grant to plaintiffs some portion of a lake lying in the general area. Plaintiffs, in effect, seek specific performance as to quantity and location of the 70 acres, more or less, based entirely on the plat prepared in late January, and not on the description as set forth in the sales contract of January 6, 1973. Plaintiffs, too, seek specific performance for a lesser quality of title, through the amendment for reformation of the January 6, 1973 contract, by praying for conveyance of a one-half undivided interest, subject to abatement of one-half of the purchase price to reflect less than fee simple ownership of the whole, plus an abatement to the extent of any liens or encumbrances. The Court would draw the attention of the parties herein to the words of our Supreme Court in Citronelle Turpentine Co. v. Buhlig, 184 Ala. 404, 63 So. 951 as to specific performance actions:

> " 'In order for a complaint (sic) to procure the specific performance of a contract through a court of equity, he must show a contract that is specific, certain and complete. He cannot set up one contract and then procure the performance of another. If he contends for a certain contract as having been made between the parties, but which cannot (sic) be (sic) complied with by the respondent, he cannot procure the court to make a new or different contract from the one contended for by him, in order to get a specific performance of some contract, regardless of whether or not it was the one contended for by him as the real contract.'

"Under the evidence in this cause, the Court is more than satisfied that the purpose of reformation is to secure for plain-

tiffs what would at most, be available to them and not to have or make the contract, as reformed, speak the true agreement reached by the parties on January 6, 1973. For this reason, the amendment seeking reformation must be denied.

"The Court finds as a fact from the evidence that the contract is impossible for the defendants to perform as to quantity and quality of title. Defendants cannot convey more than an undivided one-half interest in and to the 199 acres or any part thereof. The owner of the remaining undivided one-half interest is unwilling to convey any part of her interest to the 199 acres, or any part thereof. The Court further finds that the lien holder is unwilling to release any part of the 199 acres, without payment in full of the unpaid mortgage balance due. This Court cannot, therefore, order the defendants to convey a fee simple title. The Supreme Court in the case cited above, Citronelle Turpentine Co. vs. Buhlig, speaking to this point stated:

" 'Where defendant cannot perform a contract without obtaining the consent of a third person, who is free to withhold his consent, and does withhold it, the decree will not be made.'

"The Court finds as a fact from the evidence that the description of the land to be conveyed, as to location, is uncertain. The parties did walk over the ground to various points before execution of the contract. However, the survey itself reflected the lack of meeting of the minds as to the exact location of the land. The plaintiffs have agreed at trial to take certain boundaries on the east side in accordance with expressed contentions of the defendants that no part of the land to be conveyed would include the lake or its border. But, to the Court, this is an after expressed concession and not a part of the January 6, 1973 contract. However, it does reflect the uncertainty as to exact location of the 70 acres to be carved from the total of 199 acres, or even from Lot #5, no part of which lies in Section 36, or at least no part

of Lot #5 lying in Section 36 was to be included in any conveyance by defendants to the plaintiffs.

"The Court is well aware of the principle that abatement in price is proper under some conditions and then, with such abatement in price, to compensate for deficiency in quantity and quality of title, proceed to decree ordering a conveyance by the vendor. Upon consideration of such principle, the Court is of the opinion that this proceeding is not one in which such an order should be entered. . . . "

The evidence shows that the land is subject to encumbrances as follows:

Mortgage for $7,480.00; judgment against James O. Gunter for $1,213.55; judgment against Mrs. O. J. Gunter for $4,280.00; a total of $12,973.55.

In affirming a judgment denying specific enforcement of a contract to sell land, this court said:

"The right to specifically enforce the performance of a contract is not absolute. Its enforcement in a measure, at least, rests in the sound discretion of the court, a judicial discretion, of course, to be exercised according to the principles of equity. It has been held that contracts which will be thus enforced must be fair, must be reasonable, and must be just, and not attended with excessive hardships or injustice. Courts of equity have frequently refused to enforce contracts when it appeared that they were founded on mistake or surprise to such an extent that their enforcement would be inequitable. Tombigbee Co. v. Fairford Co., 155 Ala. 575, 47 So. 88.

"It is also a principle of equity jurisprudence, that, before a court of chancery will specifically enforce a contract, it must be made to clearly appear to the court that it is thereby enforcing the contract which the parties made, and of this the pleadings must give distinct information. The court will not attempt to make a contract for the parties, and enforce it,

even though it be one which the parties might and ought to have made. Homan v. Stewart, 103 Ala. 644, 16 So. 35." Gachet v. Morton, 181 Ala. 179, 182, 61 So. 817, 818.

This court has also said:

"Neither party to a contract is entitled to specific performance as a matter of right, but the granting or withholding of specific performance is within the sound judicial discretion of the court, controlled by fixed rules and principles, in view of the special features and incidents of each case. Cowin v. Salmon, 244 Ala. 285, 13 So.2d 190; Homan v. Stewart, 103 Ala. 644, 16 So. 35; Rice v. Sinclair Refining Co., 256 Ala. 565, 56 So.2d 647." Owens v. Cunningham, 266 Ala. 203, 205, 95 So.2d 74, 75.

In the instant case, after hearing testimony ore tenus the court concluded that the description of the land to be conveyed is uncertain and that specific performance should be denied.

We affirm the trial court.

Affirmed.

MERRILL, HARWOOD, MADDOX, and FAULKNER, JJ., concur.

HEFLIN, C. J., and BLOODWORTH, McCALL, and JONES, JJ., dissent.

JONES, Justice (dissenting):

This appeal from the Circuit Court of Russell County involves a suit for reformation and specific performance of a January 6, 1973, real estate sales contract for approximately seventy (70) acres of land for $21,000, free and clear of all encumbrances.

The sellers'/appellees/ (the Gunters) defense was vagueness of the contract, failure to agree on a specific 70 acres, inability to convey free and clear of encumbrances, and alteration of the contract.

The trial Court in refusing to reform the contract or to grant specific performance concluded that the parties are in complete disagreement as to the west boundary and that the contract is impossible for the sellers to perform as to quantity and quality of title. Hence this appeal.

Two substantive issues are presented: 1. Whether a buyer can require a seller in equity to perform his contract to the extent he is able, where the seller, without the knowledge of the buyer, contracts to sell a greater interest than he has in certain real estate. 2. Where the legal description is not set out with absolute certainty in the sales contract, but the seller subsequently fixes the legal description pursuant to his contractual obligation to furnish a warranty deed, can specific performance be enforced by the buyer against the seller? Stated otherwise, this second issue is whether the seller is estopped from asserting the uncertainty of the description as a defense to the performance of the sales contract where he, pursuant to his contractual obligation to furnish a warranty deed, more particularly fixes the boundaries of the property in question, and where the buyer is willing to accept the property as so described.

I would resolve both issues in favor of the appellants-buyers (the Websters) and, therefore, I would reverse and remand with instructions.

On January 6, 1973, the date the sales contract for the 70 acres was executed, the Gunters were joint owners of an undivided one-half interest in a 199-acre tract of land. The land was encumbered by a mortgage to the Federal Land Bank with a $7480 principal balance. The 199 acres was divided by a road with approximately 98 acres located on the east side of the road. The 70 acres involved in the instant case was part of the 98-acre parcel. Located on the 98-acre tract was a lake, a tenant house, and a barn that the parties agreed were not to be included in the 70-acre description. The parties agreed that

the west boundary of the 70-acre tract was to be near the lake which left a grazing strip by the lake for Mr. Gunter's cattle. Since there were fences or roads on three sides of the 70 acres, the major discussion concerned the fourth side near the lake. Prior to the January 6 signing, the sellers, the buyers, and the sellers' real estate agent physically walked over the land with the parties discussing where the line representing the fourth side would be located.

At the time the sales contract was prepared, no survey had been run on the 70-acre tract. Without such a survey, the parties executed the contract which gave the best description available at the time. The parties orally agreed that the vendors would have a survey prepared, and James Gunter subsequently employed Henry Moore for that purpose. On direct examination Moore testified as follows:

"Q. Did Mr. Gunter, while you and he were on the land, tell you what to survey out?

"A. Yes sir. Well, Mr. Gunter said he wanted 70 acres, more or less, and he wanted to be sure that the lake was out of it; and we more or less picked the area to go around the lake to leave it out, the part that he wanted to leave out."

When Gunter saw the survey Moore had prepared, he informed Moore that the west boundary was too close to the lake. In compliance with instructions from Gunter, Moore made a second survey of a 3.4-acre parcel which in effect moved the west boundary of the original 70-acre tract further from the edge of the lake, leaving the parcel as finally platted by the survey containing 66.6 acres.

The mortgagee would not give a partial release on the 199-acre tract, and James Gunter could not get his aunt and uncle who were the other joint owners in the 199-acre tract to agree to sell their interest in the 70 acres.

When the Websters tried to close the purchase of the property specified in the sales contract, the Gunters refused to furnish a warranty deed. The Websters then brought suit for specific performance. Subsequently, the Websters' attorney discovered that the Gunters owned merely an undivided one-half interest in the property; and the Websters amended their complaint, praying for reformation of the contract and for specific performance as to the Gunters' undivided one-half interest in the subject land with an abatement of the purchase price commensurate with the interest acquired.

As to the first issue (right of specific performance by buyer as to less than whole interest), the facts here, in all material aspects, are analogous to the facts in our recent case of Christian v. Rabren, 290 Ala. 45, 273 So.2d 459 (1973), and the legal principles set forth therein are fully applicable and controlling here.

The Court below, in holding the contract unenforceable, expressly relied upon Citronelle Turpentine Co. v. Buhlig, 184 Ala. 404, 63 So. 951 (1913). *Citronelle* is factually distinguishable from the instant case in that in *Citronelle* one document was signed that was expressly conditional on a subsequent document that was absolutely subject to the approval of a third party. An indispensable element of contract—a meeting of the minds—was there missing.

In the instant case, there was no third party who had the absolute power to give, or refuse to give, approval to the transaction. Indeed, not only did the sales contract not expressly condition its validity on the approval of a third party, but it was the sellers, as well as their agent, who assured the buyers that only their (the sellers') signatures were required to convey fee simple title. Consequently, here, the sellers could execute a deed to their one-half interest in the subject property, and they could pay off the mortgage with proceeds of the sale, both without approval of a third party.

It follows, then, that where, as here, the contract is complete (that is, not conditioned on a subsequent act subject to approval of a third party), specific performance pro tanto at the election of the buyer is a recognizable remedy, and the buyers are entitled to have the sales contract enforced to the extent the sellers are able to convey. Christian v. Rabren, supra.

As to the second issue (uncertainty of description), it is essential to an understanding of any resolution of this problem that we put in perspective the nature and scope of the dispute between the parties. Neither the pleadings (including the pre-trial order) nor the proof focus the 3.4 acres (the difference between the original 70 acres and the corrected 66.6 acres) as the subject matter in dispute. Stated otherwise, if the buyers upon finding the survey stakes as originally placed by Moore marking the western boundary of the 70-acre tract, insisted that this was the precise line agreed upon, and if the sellers countered with the contention that the latter survey containing 66.6 acres was an accurate description, and if this factual issue was framed by the pre-trial order and proof adduced, we should not hesitate to affirm the trial Court under our traditional rules of review.

To the contrary, however, the sellers, while using the 3.4-acre difference between Moore's first and second surveys as the basis for their contention of uncertainty of description in avoidance of the contract, refused to sell the lesser acreage (66.6). The buyers, on the other hand, do not ground their offer to close the sale (and their prayer for specific performance) on the restrictive condition that the property purchased contain the full 70 acres.

Moreover, it was the sellers who furnished the general description contained in the sales contract as well as their unilateral act, in complying with their contractual obligation, in having the land surveyed and platted by Moore.

A good statement of the general law, here applicable, is found in 71 Am.Jur.2d, Specific Performance, § 117, pp. 149–150:

" . . . in order to be specifically enforceable, a contract for the sale of land must describe the land to be sold with sufficient certainty to enable it to be definitely located. But reasonable certainty is all that is required, and if the description of land is sufficiently certain to enable the land to be located and examined, it is sufficient to justify specific performance of the contract. The description need not be given with such particularity as to make a resort to extrinsic evidence unnecessary, and such evidence is allowed in order to apply the written agreement to its subject matter. It has thus frequently been held that in an action for specific performance of such a contract, latent ambiguities in the description of the premises involved may be aided by extrinsic evidence. Extrinsic evidence is admissible to connect a sufficient description to its actual location on the ground."

Where, as here, any uncertainty that may have existed in the general description furnished by the sellers and contained in the sales contract was subsequently made definite and certain through the unilateral action of the sellers by way of a survey and a plat, the sellers cannot defeat an action for specific performance in the event the buyers are willing to accept the property as subsequently described. Stated another way, it is axiomatic that in order for a justiciable issue of certainty of description to exist, the parties must be in disagreement as to such issue. This is not the case with respect to the 66.6-acre tract.

In summary, so long as the buyers agree to accept an undivided one-half interest in the tract of land encompassed by the revised survey, i.e., the 66.6-acre tract, they should be entitled to specific performance of the contract subject to an abatement of the purchase price commensurate with the sellers' interest, viz., $10,500, free and

clear of all encumbrances. Rather than leave the Websters to their remedy at law for the breach of contract, I would reverse and remand with instructions to grant relief by way of specific performance.

HEFLIN, C. J., and BLOODWORTH and McCALL, JJ., concur.